Edward A. MYERS, DR.,
Plaintiff–Appellee,

v.

COUNTY OF ORANGE and City of Port Jervis, Defendants–Appellants,

Francis D. Phillips, II, Joseph A. Duryea, Gary Horr, Michael Prieto and Michael Halloran, Defendants.

Nos. 97–9055, 97–9093.

United States Court of Appeals, Second Circuit.

Argued March 10, 1998.

Decided Sept. 1, 1998.

Richard B. Golden, County Attorney for Orange County, Goshen, New York, for Defendant–Appellant County of Orange.

Monte J. Rosenstein, Rosenstein, McKenna & Bonney, Middletown, New York, for Defendant–Appellant City of Port Jervis.

Robert N. Isseks (Alex Smith, on the brief), Middletown, New York, for Plaintiff–Appellee.

Before: OAKES, WALKER, and MAGILL, Circuit Judges.*

JOHN M. WALKER, JR., Circuit Judge:

Defendants-appellants County of Orange and City of Port Jervis appeal from the August 18, 1997 judgment of the United States District Court for the Southern District of New York (Lisa M. Smith, *Magistrate Judge*), after a jury verdict, awarding plaintiff-appellee Dr. Edward A. Myers $375,000 against County of Orange and $200,000 against City of Port Jervis for their implementation of unconstitutional "first-come first-served" cross-complaint policies; and denying defendants-appellants' post-trial motions, pursuant to Fed.R.Civ.P. 50(b) and 59(a), for judgment as a matter of law or, alternatively, for a new trial.

We hold that a policy by a police department or district attorney's ("DA") office favoring an initial complainant over a later one without giving primary regard to the particular facts involved in the case violates the Equal Protection Clause of the Fourteenth Amendment. We also hold that, where a district attorney in New York implements a policy directing a police department and assistant district attorneys not to entertain cross-complaints, that policy is imputed to the county, not the State of New York, for purposes of 42 U.S.C. § 1983 liability. The judgment of the district court is therefore affirmed.

### Background

The following facts are taken from the evidence introduced at trial in the instant action. In 1991, the County of Orange's ("Orange County" or "County") District Attorney's office promulgated a written policy stating, *inter alia*, that the "[p]olice are directed not to entertain cross complaints"— *i.e.*, any complaint by a person named as a wrongdoer in a prior related civilian complaint—until the initial complaint had been either dismissed or prosecuted. The cross-complaint policy is set forth in an appendix to this opinion.

According to the testimony of at least three officers of the police department ("department") of the City of Port Jervis ("Port Jervis" or "City"), located within Orange County, and others, the department at that time had a similar, unwritten "first-come first-served" complaint policy. With these cross-complaint policies in mind, we turn to the facts underlying Myers' action.

### The Incident Between Myers and Alan Mills

1. *The Myers Version.* According to Myers, on August 24, 1991, a grey Corvette trespassed upon and then sped away from his property. Myers' son gave chase on his bicycle. Suspecting that neighbor Jake Mills owned the car, and concerned that his son had bicycled after the Corvette, Myers drove to the Mills residence approximately a quarter of a mile away. Myers saw the Corvette in the Mills' driveway, leaned out of the car window to speak with Alan Mills ("Mills"), and asked Mills to summon Jake Mills. When Mills refused, Myers drove past the Mills residence, turned his car around at a dead end in the street, and then started to drive home past the Mills residence. When Myers approached the residence, however, the Corvette stood crossways in the middle of the road next to Mills. At least three adult men, presumably members of the Mills family, were screaming at the side of the road. After Myers stopped in front of the Corvette, Mills approached Myers' car, pushed its hood, and walked to the driver's side; "there was a loud bang and glass went flying all over" Myers; and Mills punched Myers in the right eye through the open driver's side window. Myers then drove around the Corvette and, without striking anyone with his car, drove directly home.

2. *The Mills Version.* According to the Mills family's version of events, however, Myers drove toward Mills after turning back from the dead end, skidded and then struck

---

* The Honorable Frank J. Magill, of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Mills' legs and knees with his car, knocking Mills to the ground. After Bobby Mills threw a rock at Myers' car, Myers stopped the car, turned around in the driver's seat, pointed a gun through the smashed-in back window, fired a shot in the Mills' direction without hitting anyone, and then drove away.

### The Police Investigation

Mills immediately called the Port Jervis police department to report the altercation, and Officer Michael Prieto was sent to the Mills residence. Some minutes later, Myers returned home and Myers' then-girlfriend Peggy Myers telephoned the department to report the incident. She testified as follows:

> [W]hen I called [the Port Jervis police], they kind of laughed at me on the telephone. They said we already got the call.... And [the officer] said that isn't the story we got, but we'll send someone up.

Officer Michael Halloran was "sent to interview Dr. Myers," but testified that Officer Prieto, not himself, was "the investigating officer of this incident." At the Mills residence, Officer Prieto took notes of Mills' account, searched for but found no signs of a bullet hitting the ground, directed the Mills family to file a formal complaint at the police station, and then left for the Myers residence.

In the meantime, Officer Halloran arrived at the Myers residence, where he saw the rear window of Myers' vehicle smashed by a piece of macadam that lay in the back seat. Shortly thereafter, Officer Prieto arrived at Myers' residence. Myers testified as follows: "I tried to tell [Halloran] what happened, okay, and he just told me to shut up. And then I tried again and he said he already knows what happened. And he actually pushed me out of the way as he went over to my car." Peter Iacovino, a dry wall contractor working on Myers' house at the time, testified that Myers "was trying to talk to [the police], and they just told him to be quiet." Iacovino's co-worker Joan Vanderhoff testified that Myers "was trying to tell [the police] the story of what happened, and

they said that—the one told him to shut up, we already—you know, we don't need to hear it. We've already heard it."

Some minutes later, according to Myers,

> Officer Prieto turned around and he said the Millses said you got out of your car and shot at them, which I said that's ridiculous. If I got out of the car, there would be glass all over the place, as there is here as I got out of the car. He said, well, did you shoot? I said, listen, let's put an end to this right now. Let's do a paraffin test of my hand.[1] Take my car. Do what you have to do to test it so that there's no discussion about this.

Iacovino and Vanderhoff corroborated Myers' version as to this discussion between Myers and Officer Prieto. We note that Prieto's alleged account of the Mills family's version of events, i.e., that Myers "got out of the car and shot at" Mills, differs from Mills' statement that Myers shot at Mills through the car's back window.

Officer Halloran testified that he took no notes of his discussions with Myers, took no photographs, did not retrieve the macadam in Myers' car, did not ask Iacovino, Vanderhoff, or any other individuals at the Myers residence whether they had witnessed or otherwise knew about the altercation, and—notwithstanding Myers' offer—did not perform a paraffin or other gun powder residue test on Myers' hands or car. Officer Prieto, who saw himself as "handling the investigation from the Mills['] end," stated that he also "conducted no investigation" at the Myers residence. Neither Officer Halloran nor Officer Prieto asked Myers to file a complaint at the police station; rather, upon Myers' request to do so, Officer Halloran informed Myers that he could come to the police station after his injuries had been checked at the hospital. Both officers left the Myers residence after approximately twenty minutes, leaving Myers' car and the macadam untouched. Sergeant Joseph Duryea, who took over the case from Officer Prieto that night, also had no recollection of interviewing

---

1. A "paraffin test" is "a test in which a paraffin cast of the hand of a person suspected of firing a gun is subjected to chemical analysis to determine the presence of powder particles." Webster's Third International Dictionary (1981).

Myers or examining his car. He confined his investigation to taking and reviewing statements of the Mills family and visiting the Mills residence.

Myers, who felt "pretty shaken," then went to the hospital for treatment, and returned home around 9:30 or 10:00 where he remained through the night. The same evening at the police station, members of the Mills family filed statements that formed the probable cause basis for Myers' arrest warrant issued that night by a Port Jervis City Judge.

The next morning, August 25, 1991, Officer Gary Horr of the Port Jervis police arrested Myers on charges of reckless endangerment in the first degree for "discharg[ing] a firearm towards" three members of the Mills family, *see* N.Y. Penal Law § 120.25, and reckless endangerment in the second degree for deliberately "strik[ing] [Alan Mills] with [Myers'] vehicle." *See* N.Y. Penal Law § 120.20. According to Myers, on August 26 he met with his attorney, who advised him to make no statement to the police.

*Myers' Investigation*

On August 26, 1991, Myers hired private investigator Kenneth Graham to conduct an investigation of the incident. It is undisputed that on October 7, 1991, as a result of that investigation and prior to trial, Myers presented to the Orange County DA's office the following information:

1. Graham's forensic scene investigation report ("report"), which stated that "[t]he interior of [Myers'] vehicle was checked for [p]owder residue or powder burn evidence of puncture holes which may have been caused by the discharge of a firearm from within the vehicle, with [n]egative results." Given the car's small interior area, Graham "expect[ed] to find firearm residue if [the] weapon had been discharged in [the] vehicle."

2. Notwithstanding Mills' allegation that Myers drove the front of his car into Mills' legs and knees, the report stated that "[i]n the area of the front hood and bumper" of Myers' car, "there is [n]o evidence of anything coming in contact with the vehicle, the dirt and dust being in-tact."

3. Latent fingerprints from the top and left side of Myers' car's vehicle hood.

4. An August 26, 1991 ballistics investigation, indicating that none of Myers' three licensed guns had been discharged since their last cleaning.

5. Hospital emergency room reports of Mills and Myers, stating that Mills suffered no knee abrasions or "evidence of fracture or dislocation," and that Myers had a "red, swollen" right cheek area with "fair abrasion."

Assistant District Attorney ("ADA") Anthony Brock refused to consider most of this evidence, for the principal reason that Myers' "vehicle [and guns were] in the control of [Myers] for two days, which tainted the results." For example, the ballistics report of Myers' licensed guns told Brock "absolutely nothing," because he "fully expect[ed] Dr. Myers to clean a weapon if he had used it in a crime prior to turning it in to his own person who he was going to have analyze these weapons." As to the dust on Myers' car, "Graham hadn't seen the car for two days, and he couldn't say what condition the vehicle was in right after [the altercation with Mills]." Brock also refused to analyze the latent fingerprints lifted from Myers' car.

*The State Criminal Action Against Myers*

In July 29–31, 1992, Myers was tried by a jury in Port Jervis City Court on two counts of reckless endangerment in the second degree; one for hitting Mills with Myers' car, and one for discharging a firearm towards members of the Mills family.[2] The prosecution relied principally upon the eyewitness testimony of members of the Mills family, and introduced no evidence of skid marks, the alleged discharged bullet, or residue on Myers' guns, hands, or vehicle. The jury acquitted Myers of the firearm charge but convicted him of intentionally hitting Mills with his car. Myers was sentenced to a $1,000 fine, $100 in restitution, withdrawal of

---

**2.** The DA had previously reduced the firearm charge to reckless endangerment in the second degree.

his gun permits, and community service. On appeal, the Supreme Court of the State of New York, Appellate Term for the Ninth and Tenth Judicial Districts, unanimously reversed Myers' conviction on the ground that "[t]he evidence adduced upon the trial was insufficient to support a finding that the defendant had recklessly engaged in conduct which created a substantial risk of serious physical injury to another person." *People v. Myers,* No. 93–156 OR CR (N.Y.App.Div. Oct. 25, 1993).

Myers testified that, during the over two years between his arrest and the reversal of his conviction, he paid $50,370.85 in legal fees for his defense, suffered "embarrassment, humiliation and damage to his reputation," and faced a disciplinary proceeding (that was ultimately withdrawn) brought by the New York State Board of Regents to revoke his license as an orthodontist.

*The Instant Federal Action*

On June 14, 1994, Myers filed a 42 U.S.C. § 1983 action against County of Orange District Attorney Francis D. Phillips, II, the City of Port Jervis, Sergeant Duryea, and Officers Horr, Prieto, and Halloran. The original claims against the individual defendants were false arrest and imprisonment, excessive use of force during arrest, malicious prosecution, and violations of the Fourth Amendment and Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments of the Constitution. The complaint also claims that Orange County and Port Jervis implemented an unconstitutional policy of refusing to accept cross-complaints in criminal cases, and failed to properly train their respective employees in connection with cases involving cross-complaints.

Prior to trial, Myers discontinued the action against Sergeant Duryea and Officers Prieto and Halloran, and, except for the excessive force claim, against Officer Horr. On December 14, 1994, the district court (Vincent L. Broderick, *District Judge*), dismissed the complaint against defendant Phillips "on grounds of absolute prosecutorial immunity to the extent the complaint seeks money damages from him in his individual capacity." *Myers v. County of Orange,* 870

F.Supp. 555, 556 (S.D.N.Y.1994). The district court also held "that any general policy favoring an initial complainant over a later [complainant] without giving primary regard to the particular facts involved, violates the Fourteenth Amendment" on due process and equal protection grounds. *Id.*

After a series of reassignments, the action was transferred to District Judge Barbara S. Jones and, pursuant to 28 U.S.C. § 636(c), to Magistrate Judge Lisa M. Smith for trial. Following a six-day trial, the district court charged the jury that "[a]ny general, blanket policy which automatically favors an initial complaint over a subsequent complaint without regard to the particular facts involved would violate the provisions of the Fourteenth Amendment." On April 7, 1997, the jury returned a verdict in favor of Myers against Orange County in the sum of $375,-000 and against Port Jervis in the sum of $200,000 for their implementation of unconstitutional cross-complaint policies. The jury also found the County and City each liable for $100,000 on the failure to train claims. The jury found Officer Horr not liable for excessive force against Myers, and the complaint was dismissed as against him.

Orange County and Port Jervis thereafter moved for judgment as a matter of law and in the alternative for a new trial, pursuant to Fed.R.Civ.P. 50(b), 59(a). Magistrate Judge Smith denied these motions, concluding that there was "sufficient evidence" to support the jury's finding that ADA Brock "prosecuted [Myers] in strict accordance with the ... cross-complaint policy, and that he made his decision without giving primary consideration to the facts of the case." *Myers v. County of Orange,* No. 94 Civ. 4363(BSJ)(LMS), at 10 (S.D.N.Y. Aug. 1, 1997). The district court, however, vacated the $100,000 awards against the County and City for their failure to train, "[s]ince the jury's award of damages under the 'failure to train' theory compensates plaintiff for precisely the same injury as that dealt with in the jury's verdict on the cross-complaint policy." *Id.* at 20. Finally, the district court held that Orange County, not the State of New York, was municipally liable for the District Attorney's promulgation of the cross-complaint policy. *Id.* at

27. Orange County and Port Jervis now appeal. Myers does not cross-appeal.

## Discussion

### I. Sufficiency of the Evidence to Withstand Judgment as a Matter of Law

█ A motion for judgment as a matter of law ("JMOL"), pursuant to Fed.R.Civ.P. 50, may not properly be granted

> unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]. The same standards govern the court of appeals in its review of the decision of a motion for JMOL.

*Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998) (quotation marks and citations omitted, alterations in original).

### A. Existence of a Cross–Complaint Policy

█ Port Jervis contends that "there was no evidence that the police department ever denied [Myers] the right to commence a cross-complaint" because Officer Halloran informed Myers that he could file a complaint at the police station, Myers failed to do so, and Myers in any event requested only to submit a "statement" and not a "complaint." We disagree.

The evidence was sufficient to support the jury's finding that the Port Jervis police department denied Myers the right to have his cross-complaint entertained and investigated on the same basis as the original complaint by Mills. Sergeant Duryea and Officers Prieto and Halloran all testified that, in August 1991, the Port Jervis police department did not accept cross-complaints. Tr. 130, 168, 341–42. Moreover, seen in the light most favorable to Myers, the police department's investigation, including the assignment of Officer Prieto as "investigating officer" to Mills and not Myers, Officer Prieto's direction to Mills to file a complaint, Officer Halloran's failure to suggest the same to

Myers prior to Myers' request, and the department's failure to investigate evidence that was potentially favorable to Myers, provided ample evidence that Port Jervis refused to entertain Myers' cross-complaint at all, much less seriously consider and respond to it.

### B. Causation

█ Orange County and Port Jervis argue further that no causation exists between their cross-complaint policies and Myers' injuries. "[S]ection 1983 requires that the plaintiff prove ... that the defendant caused the deprivation of his or her rights." *Taylor v. Brentwood Union Free School Dist.*, 1998 WL 220951, at *7, 143 F.3d 679, 685 (2d Cir.1998). "The critical question here is whether there is sufficient evidence in the record of [a] municipal policy, custom or practice, so that a jury could reasonably infer that the individual conduct in this case was causally connected to the policy." *Gentile v. County of Suffolk*, 926 F.2d 142, 152 (2d Cir.1991).

Orange County points to ADA Brock's testimony that, in deciding to prosecute Myers, he did not consider the cross-complaint policy, but rather determined upon consideration of all of the evidence that Myers shot the gun and drove his car into Mills. The County also observes that a part of its cross-complaint policy does elucidate the factors that ADAs should consider if, in fact, a cross-complaint is accepted. *See Appendix.* The County concludes, therefore, that "the evidence was unrefuted that neither Brock, nor anyone else from the District Attorney's Office, ever directed Port Jervis Police not to accept cross-complaints generally, or specifically as it related to [Myers]." Again, we disagree.

The first sentence of the DA's cross-complaint policy makes the unequivocal statement: "[p]olice are directed not to entertain cross complaints." Although the cross-complaint policy can be read as containing mixed messages as to how cross-complaints should be dealt with, the jury necessarily concluded that the message was not so equivocal and that the reality was as stated in the first

74

sentence of the policy. In addition, Brock rejected potential evidence favorable to Myers offered by Myers' investigator. The jury was therefore entitled to believe, if it chose to do so, that Brock was not being candid when he testified about his purported evaluation of the relative merits of the complaint and cross-complaint, but rather that Brock prosecuted Myers because Myers was named as the wrongdoer in Mills' prior complaint. Even if we assume that Brock did not blindly follow the cross-complaint policy, there was sufficient evidence first, that the policy caused the Port Jervis police department not to promptly investigate evidence potentially favorable to Myers (*e.g.,* Myers' car and guns), thereby diminishing the ultimate probative value of that evidence when offered to Brock by Myers, and second, that the diminished value of Myers' evidence contributed to Brock's decision to prosecute Myers.

■ For its part, Port Jervis contends that Brock's independent decision to prosecute Myers was "an intervening factor" that broke the causal chain between the police department's cross-complaint policy and Myers' injuries. This argument, however, ignores the impact of Port Jervis' cross-complaint policy on Brock's ability to make an independent prosecutorial decision. If the police had promptly investigated evidence favorable to Myers by securing Myers' car and guns, collecting fingerprints, performing paraffin and other gun residue tests, and taking Myers' statement, then, armed with all relevant evidence, Brock could have fairly exercised his prosecutorial discretion. Seen in the light most favorable to Myers, Brock's decision to prosecute Myers was not independent of, but rather interrelated with, Port Jervis' cross-complaint policy. *Cf. Taylor,* 143 F.3d at 686–88, 1998 WL 220951, at *8–11 (defendant who reported improper conduct by teacher did not cause teacher's suspension where independent board and hearing panel investigated complaint, brought charges, made independent findings, issued suspension, and denied appeal).

■ We also note that defendants in § 1983 actions may be held liable for "those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." *Warner v. Orange County Dep't of Probation,* 115 F.3d 1068, 1071 (2d Cir.1997) (quotation marks omitted). Here, the Port Jervis police department could have reasonably foreseen that its cross-complaint policy would more likely yield evidence favorable to Mills than Myers than if cross-complaints were given the same consideration as complaints, with the result that, instead of Mills or no one at all, Myers would be prosecuted.

■ Finally, as noted by the district court, Myers "is challenging not the District Attorney's Office's decision to prosecute him, but the implementation of the cross-complaint policy itself." *Myers,* No. 94 Civ. 4363, at 19 (S.D.N.Y. Aug. 1, 1997). Leaving Brock's decision to prosecute Myers aside, a reasonable jury could have found that Port Jervis' cross-complaint policy caused Myers to be charged, arrested, and detained, causing injury to Myers entitling him to damages for lost reputation and emotional distress, as well as attorneys' fees.

## II. *Equal Protection*

■ Having concluded that sufficient evidence supported the jury's determination that both Orange County and Port Jervis implemented a "first-come first-served" complaint policy that caused Myers injury, we next consider whether that policy violates the Equal Protection Clause of the Fourteenth Amendment. Judge Broderick held "that any general policy favoring an initial complainant over a later [complainant] without giving primary regard to the particular facts involved" violates equal protection. *Myers,* 870 F.Supp. at 556. We agree.

■ "[T]he constitutionality of a statute [or policy] is a legal question subject to *de novo* review." *United States v. Murphy,* 979 F.2d 287, 289 (2d Cir.1992).[3] The Equal

---

**3.** In her denial of defendants' post-trial motions, Judge Smith stated that "[r]easonable jurors could have reached the conclusion that [the cross-complaint] policy lacked a rational basis," suggesting that that issue was for the jury to decide. *Myers,* No. 94 Civ. 4363, at 10. The

Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." The parties agree that the cross-complaint policy does not burden a fundamental right or involve a suspect or quasi-suspect classification such as race, sex, alienage, or national origin. That policy, therefore, is "presumed to be valid and will be sustained if the classification ... is rationally related to a legitimate state interest." *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). For legislation that discriminates on the basis of non-suspect classifications, "the Equal Protection Clause allows the States wide latitude and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (citations omitted). Despite the wide latitude afforded to the States, however, distinctions that do not have a rational basis will not be sustained. *See Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 622–23, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985) (state property tax exemption for Vietnam War veterans based on date of established state residency violates equal protection rights of later veteran residents); *Zobel v. Williams*, 457 U.S. 55, 63–64, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982) (state distribution of income derived from natural resources based on length of residency violates equal protection rights of newer state residents); *see also* Laurence H. Tribe, American Constitutional Law § 16–2 (2d ed.1988).

We recognize that the efficient operation of a DA's office and the prompt resolution of investigations represent legitimate interests that the government is entitled to pursue through appropriate policies. However, efficiency is not the only goal to which police departments and DAs must direct their efforts. Law enforcement policies directed toward efficiency may not override the fundamental goals in law enforcement of truth-seeking and the impartial administration of justice. Put another way, efficiency may normally be a legitimate interest, but pursuing efficiency through policies which distort the truth-seeking process is not.

In the instant case, we agree with Judge Broderick that although

> [a] second complain[ant] might be acting to retaliate or divert attention from wrongdoing[, i]t is equally plausible that an initial complainant may make a complaint to forestall investigation, or for vindictive reasons. In either case, the factual pattern rather than who complains first properly guides subsequent police or prosecutorial investigation or action.

*Myers*, 870 F.Supp. at 556–57. Moreover, "[a] first-come-first served policy also runs contrary to the objectives of law enforcement to protect the public, since it inhibits collection of the fullest possible information from all sources relating to a potentially criminal incident." *Id.* at 557. By undermining the ability of the police department and the DA to gather all available evidence, the cross-complaint policy creates an unnecessary risk that innocent persons will be prosecuted and possibly convicted. In sum, by severely distorting the ends of justice in an attempt to resolve complaints efficiently, the cross-complaint policy serves no legitimate governmental interest. We note that Port Jervis conceded as much at oral argument.

Orange County replies that "prosecuting both cross ... complaints simultaneously" would create "the appearance of a conflict or impropriety" and cause unnecessary "delay and expense." The issue, however, is not whether a DA must *prosecute* cross-complaints simultaneously, but whether a DA and a police department must entertain cross-complaints on the same basis as original complaints, investigate all complaints based on the circumstances of the case rather than on the order in which they were filed, and on that basis determine who, if anyone, should be prosecuted. To fail to do so, we believe, distorts the even-handed pursuit of justice and violates the Equal Protection Clause.

The facts in this case serve to illustrate the policy's distortion of the goal of even-handed

issue of whether the cross-complaint policy has a rational basis and therefore does not violate the Equal Protection Clause, however, is a legal issue

for the court and not a factual issue for jury determination.

justice and impartial administration of the law. During the minutes in which Myers drove home after the altercation, Mills reported the incident to the police. When Myers returned home some minutes later and his girlfriend telephoned the police, "[the police department] said we already got the call.... And [the officer] said that isn't the story we got." The simple happenstance that it was Mills and not Myers who registered his complaint first had very real adverse consequences for Myers. There was evidence (credited by the jury) that, from that moment on, the police department and district attorney's office presumed Mills to be the complainant/victim and Myers to be the perpetrator/potential defendant. As a result, the police department failed to investigate, and ADA Brock refused to consider, evidence potentially favorable to Myers. Had Myers beat out Mills in placing the first call to the police, it is unlikely that he would have been arrested or prosecuted. If Myers had used a carphone or cellphone or if the altercation had occurred in front of Myers' home instead of Mills' home, then Myers would likely have avoided an ordeal as a criminal defendant lasting more than two years. The department's and DA's decisions to arrest, charge, detain, or prosecute Myers cannot turn on, or be influenced by, such irrelevant and irrational considerations and still pass constitutional muster.

Because we hold that the cross-complaint policy of the Port Jervis police department and the Orange County DA, which in this case favored Mills over Myers, bears no rational relationship to the legitimate governmental interest in impartial law enforcement and thus violated Myers' right to equal protection, we need not decide whether that policy also violates the Due Process Clause of the Fourteenth Amendment.

III. *County's Liability for Policy of District Attorney*

■ We now must consider whether the DA's unconstitutional cross-complaint policy results in liability for Orange County. As a municipal corporation, Orange County can be held liable under 42 U.S.C. § 1983 only for the actions of its own policymakers.

*See Monell v. Department of Soc. Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The critical issue for decision is whether, in promulgating the cross-complaint policy, the DA acted as a policymaker for Orange County or for the State of New York.

We first "ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue," an inquiry that "will necessarily be dependent on the definition of the official's functions under relevant state law." *McMillian v. Monroe County,* 520 U.S. 781, ——, 117 S.Ct. 1734, 1737, 138 L.Ed.2d 1 (1997). Under New York law, DAs and ADAs are generally presumed to be local county officers, not state officers. *See* N.Y. Pub. Off. Law § 2 (defining DA and ADA as "local officer[s]," not "state officer[s]"); N.Y. County Law § 53(1) (county is liable for torts of county officers); *Kelley v. McGee,* 57 N.Y.2d 522, 457 N.Y.S.2d 434, 443 N.E.2d 908, 912–13 (1982) (DA is not a "state officer" within state compensation law); *Fisher v. State,* 10 N.Y.2d 60, 217 N.Y.S.2d 52, 176 N.E.2d 72, 73–74 (1961) (state is not liable for ADA's tortious presentation of false information to grand jury, because ADAs are "local" "county prosecuting officers" and not "state" officers, and each "serves in and for a particular county, is paid by that county and elected by its voters and has no[ ] authority outside his county"); *Claude H. v. County of Oneida,* 214 A.D.2d 964, 626 N.Y.S.2d 933, 935–36 (1995) (county would be liable where DA "directed the police to arrest and detain [plaintiff] without a warrant"); *Morris v. City of New York,* 198 A.D.2d 35, 603 N.Y.S.2d 463, 464–65 (1993) (ADA is a county officer and therefore New York City could be liable for ADA's assault and DA's "negligent hiring, supervision and retention" of ADA); *Whitmore v. State,* 55 A.D.2d 745, 389 N.Y.S.2d 443, 444 (1976) (ADA is a local officer for whom state is not liable); *Tunia v. State,* 106 Misc.2d 601, 434 N.Y.S.2d 846, 849 (N.Y.Ct.Cl.1978) (Court of Claims has no jurisdiction over DA because DA "is a county employee"); *Fonfa v. State,* 88 Misc.2d 343, 388 N.Y.S.2d 65, 68 (N.Y.Ct.Cl.1976) (DA is a local officer for whom state is not liable).

New York courts recognize a narrow exception to this general rule when a prosecutor makes individual determinations about whether to prosecute violations of state penal laws. *See Johnson v. Town of Colonie,* 102 A.D.2d 925, 477 N.Y.S.2d 513, 514 (1984) (dismissing malicious prosecution action against county); *Zimmerman v. City of New York,* 52 Misc.2d 797, 276 N.Y.S.2d 711, 714–15 (N.Y.Sup.1966). Although a county cannot be held liable for an ADA's improper filing of an indictment, *see Baez v. Hennessy,* 853 F.2d 73, 77 (2d Cir.1988), a county can be liable based upon its "long history of negligent disciplinary practices regarding law enforcement personnel, which gave rise to the individual defendants' conduct in promoting the malicious prosecution of plaintiffs." *Gentile,* 926 F.2d at 152 n. 5. In *Walker v. City of New York,* 974 F.2d 293 (2d Cir.1992), a case in which "prosecutors covered up exculpatory evidence and committed perjury in order to insure [defendant's] conviction," *id.* at 294, we held that a county could be liable for the "district attorney's management of the office—in particular the decision not to supervise or train ADAs on *Brady* and perjury issues," *id.* at 301. Noting that *Baez* was "confined … to challenges to specific decision[s] of the District Attorney to prosecute," we held that "[w]here a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." *Id.* at 301 (quotation marks omitted) (first alteration in original).

In the instant case, the County was found liable not for ADA Brock's decision to prosecute Myers, but for a DA policy that directed the Port Jervis police and county ADAs to engage in investigative procedures that violated Myers' equal protection rights. Orange County's liability for the DA's managerial decision to implement the cross-complaint policy is on a par with a DA's "direct[ion to] the police to arrest and detain [plaintiff] without a warrant," *Claude H.,* 626 N.Y.S.2d at 935–36, a DA's "long practice of ignoring evidence of police misconduct and sanctioning and covering up wrongdoing," *Walker,* 974 F.2d at 301 (citing *Gentile,* 926 F.2d at 152 n. 5), and a DA's "decision not to supervise or train ADAs on *Brady* and perjury issues," *id.,* all of which would result in

county liability. Thus, Orange County was properly found liable.

### Conclusion

The judgment of the district court is affirmed.

### ATTACHMENT

### Appendix: District Attorney's Cross–Complaint Policy

Police are directed not to entertain cross complaints. In some cases complaints will be filed by individuals on both sides of an incident. Each will claim that the other is responsible for the criminal conduct. Typically, this occurs in assault cases where a brawl erupts and all of the participants sustain injuries. When it is not possible to decide who the victim is, it may be permissible to decline prosecution of either side of the criminal case.

Do not decline prosecution in cases where a cross complaint is filed as a tactic to get the District Attorney out of the case.

For example, an assault complaint that is followed by a cross complaint, filed some time after the actual incident is immediately suspect. The Assistant District Attorney has the responsibility of investigating such cases and prosecuting even though a cross complaint has been filed. In such an instance, the most meritorious or believable complaint should be tried first. The verdict in that case may very well resolve the cross complaint. If investigation discloses that the second complaint filed is the legitimate one, there is no reason why the Assistant District Attorney cannot elect to go forth with the prosecution of that case first.

In every instance of this sort, communications between the prosecution and the complainant-defendant must be with the understanding that any privilege is waived by the "complainant". Where the incident results in serious physical injury, cross complaints should be presented to the Grand Jury and both parties must be required to testify *after* signing a waiver of immunity.

In cases where cross complaints are filed, take care to interview the victim/complainant

in the presence of their attorney after giving him his *Miranda* Warnings.

Discuss these cases with a Supervisor.