[614 NYS2d 977]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v ALBERTO RAMOS, Respondent.

First Department, July 14, 1994

APPEARANCES OF COUNSEL

*Richard Sheridan* of counsel *(Peter D. Coddington* with him on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for appellant.

*Joel B. Rudin* for respondent.

**OPINION OF THE COURT**

ELLERIN, J.

The facts before us on this motion pursuant to CPL 440.10 dramatically illustrate the crucial role played by the rules obligating the People to provide the defendant with all relevant *Rosario* and *Brady* material to insure that a fair trial is had and the catastrophic consequences that can ensue upon the People's failure to fulfill their obligation in that regard.

Defendant, Alberto Ramos, was convicted in 1985 of two counts of rape in the first degree stemming from the allegation that, left alone in charge of a day-care center classroom of five year olds, defendant brought one of the children into the bathroom, closed the door and raped her. This was the first of the then highly publicized Bronx day-care center sexual abuse cases to go to trial.

The evidence at trial established that defendant, a 22-year-old college student and part-time substitute teacher's aide, had been working at the Concourse Day Care Center for approximately a month when, on Friday, February 17, 1984, he was left alone with the five-year-old class for at least 15 minutes during their nap time. The allegations of rape were based on the sworn testimony of the child, who was six years old at the time of trial, who did not identify defendant in court, but who described the incident in some detail and

reenacted it using anatomically correct dolls. She also testified that, while they were in the bathroom, defendant had put tape across her mouth. Although at first she stated that both she and defendant had remained standing, after several questions she stated that defendant had been kneeling during the incident, which, according to her description, involved partial penetration. In her testimony, the child acknowledged that she had at first stated that Ephraim, a boy in her class, had been the one who touched her vaginal area, but said that she had said that because she did not want anyone to know it was defendant.

That portion of her testimony indicating that defendant had taken her to the adjacent bathroom (which meant that the rest of the class was left completely unsupervised) was supported by another child of the same age. The reliability of the testimony of the second child, who apparently was not interviewed about the incident until six months after it had happened, was diminished by the fact that she testified to nothing more memorable than having seen the defendant and the child go into the bathroom and having noticed that the child was crying when they came out. She also testified that the alleged victim did not have tape on her mouth. Moreover, the children's day-care teacher, Mrs. Skerrit, as well as another teacher's aide, testified that when they entered the classroom after the period in which defendant had been alone with the children, the alleged victim was not crying and did not seem upset. Mrs. Skerrit also testified that the children were unusually quiet when she returned and that she noticed after defendant left that some of the children, including the child at issue herein, had masking tape on their mouths, which she removed. When asked why she had tape on her mouth, the child replied only that Alberto had put it there because she had been talking. When defendant was later admonished for having put tape on several of the children's mouths he acknowledged that he had done so to remind them not to talk during nap time and agreed not to do it again. The fact that defendant had admitted "taping the mouths of the children" with what the prosecutor described as "adhesive tape" was referred to repeatedly at trial, although it appeared to be unrelated to the alleged sexual abuse. Significantly, Mrs. Skerrit also testified that she had never seen the child masturbate.

Also damaging was the testimony provided by the child's grandmother, who stated that, when she picked the child up

on the day of the alleged incident, the child had tears in her eyes, and that the child later seemed sad and complained of pain in the genital area, about which the grandmother informed the child's mother. The child's mother testified that, in accordance with her daily routine, when she arrived home from work at 2:00 A.M. the next morning she bathed the child, who was still up and awake. Although she had noticed for several days that the child's genital area was reddened, on this night she detected much more severe redness and a foul odor and noticed that the child's underwear bore "drip stains." In addition, she noticed that the child was afraid to let the washrag touch between her legs. She nevertheless did not think anything of it and, after washing the child's underwear, she went to bed. In spite of the mother's testimony that she did not suspect anything that night, the child's own testimony implied that she had implicated the defendant as early as that night, i.e., in response to the inquiry, "After the day that you told us that Alberto put tape on your mouth, did you talk to your mother that night?", the child responded that she told her mother, "Alberto."

The next night, when the mother returned from work at 1:00 or 2:00 A.M., she again bathed the child and now noticed that the child's genital area was bruised and still had a foul odor, so she took her to the emergency room at Bronx Lebanon Hospital. Although an offer of proof was made that the mother would testify that at that point the child told her that she had been abused and named the defendant, the court rejected the prosecutor's request to permit the mother to testify as to the content of any statements the child made. Nevertheless, the mother was questioned in such a way as to give rise to the irresistible implication that the child had named the defendant.

The doctor who examined the child at the emergency room early Sunday morning was not called to testify. However, prosecution witness Dr. Annette Vasquez testified with respect to the emergency room records covering that initial visit which indicated that the doctor had found that the child's vaginal area was bruised, that her hymen, although intact, was slightly stretched, and his recommendation that the next doctor to see the child should take steps to rule out sexual abuse as a cause. Other portions of those records which apparently were not admitted into evidence indicate that the child told hospital personnel that a boy, who was older than she, had pulled down her pants and touched her vaginal area,

that boys went into the girls' bathroom and no one watched them and that the person who touched her was named Ephraim. The records do not indicate that the child's mother offered any different information.

When the child returned, as scheduled, on Tuesday, February 21, she was examined by Dr. Vasquez who found that there was still redness in the genital area and that the hymen, although intact, was slightly larger than normal. She noted, however, that hymens vary considerably from person to person. A test for the presence of sperm or venereal disease was negative, but she testified that sperm would stay alive, at the most, for only 72 hours. The doctor testified, over objection, that her conclusion that the child had possibly been sexually abused *was based on the fact that the child was able to give "such an accurate description of everything that happened"*. (Emphasis added.) While this statement, implying that the child had made an accusation, was admitted into evidence, the content of the accusation was not.* (While not before us on this motion, the propriety of admitting such testimony may be questioned in light of the Supreme Court's decision in *Idaho v Wright* [497 US 805], holding that an expert may not repeat a child's hearsay accusation without an initial determination as to whether the expert conducted the interview with the child in a way that was not unduly suggestive.)

Two days later, on Thursday, February 23, the child and her mother met with Tecla Menondez, the director of the day-care center. While the content of their conversation was not admitted into evidence, the implication was left with the jury that, according to Menondez, the child had now accused defendant of having abused her. Thereafter, defendant was no longer called to work at the center, where the child continued to attend.

Although the New York City Human Resources Administration (HRA) shortly thereafter commenced an investigation of these charges, the police were not brought into the matter until May 1984.

The defense was limited to evidence from two other day-care

---

* The contemporaneous hospital documentation drawn up to report the abuse allegations does not indicate that either the child or her mother named defendant, although it does indicate that the child had now told hospital personnel that she had been touched by an adult rather than by another child and that she had been touched by the man's penis as well as his finger.

workers tending to prove that the time during which defendant was alone with the children was no more than 15 minutes and that other persons had easy and open access to the classroom while defendant was in charge.

Defendant was convicted of two counts of rape in the first degree and sentenced to the maximum sentence of 8⅓ to 25 years in prison. He had served over seven years of that sentence when the instant motion pursuant to CPL 440.10, to vacate his conviction, was granted and he was released pending a new trial.

The motion is based on a claim that the prosecution withheld from defendant certain documents, which are claimed to be either exculpatory or prior statements of witnesses who testified for the prosecution, or both. Defendant came into possession of these documents when they were sent to him by a private investigator who had been hired by the City of New York and the Concourse Day Care Center who had been named as defendants in a civil suit brought on behalf of the child to recover damages based on the incident which had resulted in defendant's criminal conviction. When the civil suit was settled, the investigator, who had formed the belief that defendant had been wrongly convicted, received permission from his employers to convey the information to defendant.

These documents are:

1. Notes of New York City Human Resources Administration Supervisor Wilson dated February 22, stating that Mrs. Skerrit and a teacher's aide had told a worker that, from the time that the child had been in the class since the prior September, she had often masturbated openly and exhibited herself to others, that the previous week, i.e., one week before the instant incident, the aide had, for the first time, informed the child's aunt of this fact, and that prior to the instant incident the child was seen using two dolls in "sex play" (document A).

2. A memorandum dated February 23, 1984 of the New York City Human Resources Administration reporting that on February 21, 1984, Mrs. Menondez, the day-care center administrator, stated that the teachers and directors had been informed that the child had accused another child of sexual abuse and that they were doubtful of the child's accusation against her classmate. The report also stated that the child was known to be in the habit of watching late night HBO

movies, that she described "sexual things she sees" and that in playing with dolls, she simulated sexual intercourse. The report further stated that on February 23, the child had been brought back to the center and that her mother now claimed that the child had been sexually abused by a substitute teacher rather than by another child (document B).

3. An undated HRA investigation report relating that when the mother first discovered the child's irritation she asked her if anyone had touched her and the child had replied no, that when the child was examined at the hospital she reported that Ephraim had touched her and that the director and teachers of the day-care center were interviewed and stated that the child was in the habit of masturbating openly at school (document C).

4. A handwritten letter dated February 22, 1984 by Merary Pizarro, an assistant group teacher, indicating that the child was "sexually wiser than the other children," that she was in the habit of masturbating at nap time and when she used the bathroom and was in the habit of exposing herself to other children (document D).

5. An HRA report dated April 25, 1984, relating that members of the day-care center staff observed the child masturbating, that, in an HRA interview the child talked about things she had seen on television including horror movies and women undressing and that at one point when she was asked what defendant had done to her she replied that he had taped her mouth and, when asked what else, she replied, "Nothing— taped my mouth" (document E).

6. A letter by HRA Supervisor Wilson dated May 3, 1985, addressed to the Trial Assistant stating, "Enclosed please find the case material on [this] case" (document F).

7. A log from the day-care center for February 17, 1984, the date of the incident, indicating that on that date the child was picked up by her aunt (document G).

At the hearing before the motion court, it further emerged that the prosecution had also been in possession of additional documents which it had not turned over to the defense, i.e., a statement by Debra Ayala, not a witness at the trial, who had been the child's teacher until two months before the alleged rape, that the child "had seemed so mature about certain matters (entertainment, music, movies, and affairs of the heart). I found the child surprisingly different and smart (streetwise) for her age" and a document whose source is not

identified which states, "The director and teachers were interviewed and highlighted that [the child] masturbated openly in the Day Care Center."

As was so aptly noted in the seminal case of *People v Rosario* (9 NY2d 286, 289), policy considerations and "a right sense of justice" underlie the rule which obligates the prosecution to produce the pretrial statements of prosecution witnesses relating to the subject matter of their testimony which are in the possession of the People (CPL 240.44 [1]; 240.45 [1] [a]; *People v Ranghelle,* 69 NY2d 56; *People v Fishman,* 72 NY2d 884). In *Brady v Maryland* (373 US 83) a similar obligation was imposed on the prosecution to disclose to the defense any evidence in its possession favorable and material to the defense, on the premise that proceedings cannot be fair if evidence is withheld which casts doubt on the guilt of defendant *(People v Vilardi,* 76 NY2d 67, 75 [Simons, J., concurring]). When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule. *(People v Cwikla,* 46 NY2d 434, 441; *People v Novoa,* 70 NY2d 490, 496.)

The critical issues in determining whether the People in this case violated their disclosure obligations are whether the undisclosed documents in issue were in the People's possession and whether the documents included any *Rosario* or *Brady* material.

Upon a review of the record, we find that the motion court, in its very thoughtful and incisive opinion, correctly found that the above-itemized documents were in the possession of the prosecution at the time of trial. Indeed, the Trial Assistant acknowledged that documents C, D, E and F were still in her case file at the time of the hearing and there was nothing presented to indicate that they were not in that file at the time of trial. As to documents A and B, the defendant satisfied his burden of demonstrating the prosecutor's possession by virtue of the testimony of the HRA supervisor who stated at the hearing that these documents were in the HRA file, that he believed he sent the prosecutor the entire file and that there would have been no reason to omit any part of the file. The only explanation offered to establish that the prosecutor did not possess these documents at the time of trial is her testimony that they were not in her file at the time of the motion, seven years later, which we find wholly inadequate to overcome the contrary evidence. As to document G, testimony

by workers at the day-care center clearly established that this document had been given to the prosecution.

The evidence at the hearing also strongly supported the court's finding that the foregoing documents had not been turned over to defense counsel. Indeed, the prosecutor admitted that she had not turned over to the defense any statements "that were opinions of teachers on the child." While defense efforts, or lack thereof, are irrelevant on the issue of the prosecutor's affirmative obligation to hand over *Brady* or *Rosario* materials *(People v Ranghelle,* 69 NY2d 56, 64, *supra),* here defense counsel was actively deterred from serving a subpoena on HRA himself because of the prosecutor's express promise to obtain and turn over all relevant HRA documents. As to the day-care center, he had learned prior to trial that its employees had been instructed by its board of directors not to cooperate with the defense and therefore was obliged to rely on the prosecution to provide him with any relevant materials.

In evaluating the character of these documents, there is no question that all of the materials, with the exception of document F, constituted either *Rosario* or *Brady* materials, or both, and that the prosecution was under an absolute obligation to turn them over to the defense.

Those portions of the documents which constituted *Rosario* material include the prior statement of the child that the defendant had not done anything to her other than tape her mouth, the prior statement of the child's mother that when she first asked the child if anyone had touched her the child had said, "No," as well as the prior statement of the child's teacher, Mrs. Skerrit, that the child had previously been seen masturbating and using dolls in "sex play".

Moreover, a review of the documents in light of the evidence at trial leaves no doubt that they contain extensive material both favorable and material to the defense and therefore constituted *Brady* material. *(Brady v Maryland, supra.)* In assessing the exculpatory impact of the undisclosed material, it is important to highlight the trial evidence that was particularly damaging to defendant. This included the child's testimony accusing defendant, the child's vaginal irritation and her explicit knowledge of the details of the alleged sexual encounter which she acted out with anatomically correct dolls, the fact that the physician based her opinion that the child had been sexually abused largely on the child's

explicit sexual description and the corroborating testimony of the grandmother with respect to the child's tearfulness when she picked her up from school on the day of the alleged incident and the child's sadness and complaints of pain in the genital area later that day. Viewed in this context, the documents contained extremely favorable evidence that would drastically have undermined virtually every aspect of the prosecution's case corroborating the child's testimony.

With respect to the child's physical condition, the defense was deprived of evidence demonstrating an extremely compelling alternative explanation for the medical evidence that the child's genital area had been subjected to inappropriate contact in that numerous witnesses reported that, long prior to the date of the alleged rape, the child masturbated with disturbing frequency and engaged in sexually provocative behavior with other children (documents A, B, C, D and E).

Moreover, this evidence (particularly documents B, D and E) also overwhelmingly demonstrated that the child's ability to accurately describe sexual behavior long predated the date of the alleged incident and that she had extensive knowledge of sexuality derived from obviously inappropriate exposure to sexual information at home. This was particularly crucial in light of the inconclusive nature of the medical evidence and Dr. Vasquez' testimony that her conclusion that the child had been sexually abused was primarily based on this young child's ability to describe what had happened. The child's description of a sexual encounter and her ability to use anatomically correct dolls to describe the sex act were also emphasized by the prosecutor in summation to support the child's credibility, by way of a rhetorical inquiry: "A five year old describing it for you, showing you how it was done. That's the type of thing a five year old child makes up?" The undisclosed documents demonstrating the child's prior knowledge of sexual matters and her prior conduct with regard to the use of the anatomically correct dolls would have sharply undercut the basis of both the doctor's opinion and the argument made on summation.

The prosecution seeks to minimize the impact of these documents by arguing that this information was already known to defense counsel by way of two documents which were possessed by the defense which also indicated that the child had been seen masturbating. Not only is such an argument unavailing to excuse the prosecutor's own failure to provide the material *(People v Ranghelle, supra)* but, unlike

the documents in issue which were withheld, those in the possession of the defense neither stated where the observations had occurred, nor identified any eyewitnesses and, significantly, did not indicate that the behavior had occurred before, rather than after, the alleged rape. Thus, the only evidence possessed by the defense could easily have been interpreted as a result of the alleged rape. Indeed, when counsel ventured into this area by inquiring of the day-care teacher whether the child had previously masturbated, he was met with a categorical denial. Without the extensive evidence which was withheld, including a statement attributed to that very witness contradicting her trial testimony, counsel had little choice but to drop the matter.

The defense was also deprived of evidence (document G) that, on the date of the incident, the child was picked up at the center by her aunt, which cast doubt on the testimony of the child's grandmother that it was she who had picked up the child and seen the child with tears in her eyes at that time and which would have provided the defense with an argument that all of the grandmother's testimony was suspect, including her testimony that the child had complained of genital pain later that evening and had seemed sad.

The crux of the defense at trial was that the entire incident never occurred and that the child's testimony was simply false, either deliberately or because she had come to believe it herself by having been subjected to repeated suggestive inquiry. The various documents in issue certainly included evidence directly impacting on the child's credibility which would have been useful to the defense in demonstrating that the child's testimony could not be considered reliable, including evidence that subsequent to the mother informing the day-care center that defendant had molested the child, when the child herself was interviewed during an HRA interview, she specifically remembered that defendant had put tape over her mouth but twice denied that he had done anything more than that. While, in child abuse cases, such inconsistencies frequently do not mean that the child's ultimate accusation is untrue, in some cases they can mean precisely that, and defense counsel was entitled to have the evidence which would enable him to appropriately address this critical issue. When added to the evidence which actually did come out at trial casting doubt on this very young child's ability to accurately relate what really happened, including her initial statement to medical personnel that it was one of her classmates who

had touched her, her inability to identify defendant at trial, and her statement to the Grand Jury that she did not know anyone named Alberto, as well as the lack of evidence that the child had a particular reason to hide the fact that she had been abused, such as evidence of a threat by her abuser, evidence of a close relationship with her abuser or evidence of acute embarrassment concerning sexual matters, the material in the various documents would have provided defense counsel with a potent argument that this was a case in which inconsistencies in the child's account should be taken at face value.

Since the record amply demonstrates that the People failed in their obligation to turn over documents in their possession containing both *Rosario* and *Brady* material, we turn to the controlling standard to be applied in determining whether defendant's conviction should be reversed. If defendant had been able to raise the People's dereliction upon his direct appeal, an automatic reversal would clearly have been mandated, without any further showing, by reason of the failure to provide the *Rosario* material previously identified. *(People v Ranghelle, supra.)* Since, however, the issue is raised in the context of a CPL 440.10 motion after defendant's direct appeal has long been concluded, defendant must demonstrate "a reasonable possibility" that he would not have been convicted had the particular evidence been available at trial *(People v Jackson,* 78 NY2d 638, 649). While the failure to produce *Brady* material which has been the subject of a specific defense request similarly requires a showing of a reasonable possibility that defendant would not have been convicted *(People v Vilardi,* 76 NY2d 67, 77, *supra),* it appears that where no specific defense request had been made for the particular material, vacatur of the judgment of conviction requires a showing of " 'a reasonable probability' " that had the evidence been disclosed to the defense the result of the proceeding would have been different *(People v Chin,* 67 NY2d 22, 33, quoting *United States v Bagley,* 473 US 667, 682).

In this case, the trial court examined the evidence that was withheld under the more stringent standard of "reasonable probability" and concluded, as do we, that the People's failure to turn over the documents in issue contributed to the verdict. Indeed, in light of the extremely negative impact which the withheld documents would necessarily have had on the People's evidence in this case, it is unlikely that a guilty verdict, based upon a record including such evidence, could withstand a weight of evidence challenge in this Court. We note that, in

the absence of a cross appeal, the issue of whether the indictment should have been dismissed pursuant to CPL 440.10 (4) is not before this Court. Nor, unfortunately, is it within our power to *sua sponte* dismiss the indictment in the interest of justice.

While the pernicious problem of child sexual abuse cries out for redress by a society that must be committed to protecting its youngest and most vulnerable citizens, that goal is irreparably damaged when an innocent person is denied a fair trial that results in a wrongful conviction, as appears here to be the case. Under our system of law the prosecutor plays an especially sensitive and crucial role, serving both as an advocate and public officer charged with the duty not only to seek convictions but also to see that justice is done, and as a public officer he or she owes a duty of fair dealing to the accused and candor to the courts *(People v Pelchat,* 62 NY2d 97, 105). In this case, the People's failure to fulfill their obligation to insure that a fair trial was had and justice done is inexcusable. As the motion court eloquently observed, "The greatest crime of all in a civilized society is an unjust conviction. It is truly a scandal which reflects unfavorably on all participants in the criminal justice system".

Order, Supreme Court, Bronx County (John Collins, J.), entered on or about June 1, 1992, granting defendant's motion pursuant to CPL 440.10 (1) (b), (f), (g) and (h) to set aside the conviction and ordering a new trial, unanimously affirmed.

CARRO, J. P., ASCH and NARDELLI, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about June 1, 1992, unanimously affirmed.