[729 NYS2d 678]

ALBERTO RAMOS, Appellant-Respondent, v CITY OF NEW YORK, Respondent-Appellant, et al., Defendant.

First Department, August 16, 2001

**APPEARANCES OF COUNSEL**

*Joel B. Rudin* for appellant-respondent.

*Margaret G. King* of counsel (*Edward F.X. Hart* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for respondent-appellant.

## OPINION OF THE COURT

TOM, J.

The last two decades have seen a laudable trend in which sexual predators, especially child molesters, are caught, convicted and incarcerated. In view of the nature of the harm done to society's most vulnerable members, diligent investigation and prosecution is to be commended. However, especially in view of the particular contempt society holds for such individuals, diligent prosecutions must also be scrupulous prosecutions to avoid convictions of innocent persons caught in the public frenzy to remove these predators from society.

When prosecutors transgress the law and wrongfully convict such a suspect, or a conviction is wrongfully obtained because material information is omitted or misstated, the results can be catastrophic for that person. Here, too, there appears to be a trend, with several such sexual abuse convictions reversed across the nation during the last few years (*see, e.g.*, James Ahearn, *For State and Nation, a Dark Chapter*, Bergen Record, Feb. 28, 2001, at B1 [discussing fabricated charges in New Jersey's Margaret Kelly Michaels case and other cases]). This is such a case.

The problem is then presented: after the defendant has spent several years in brutal confinement, an incalculable loss in view of our short tenure on earth, and after the criminal charges are finally dismissed, what civil remedy is available? Civil recovery is severely circumscribed by legitimate concerns of prosecutorial immunity in the context of a good-faith, if mistaken, prosecution, and the propriety of insulating honest, if mistaken, complainants and others who provide investigative information. But the problem of weighing these competing policy concerns becomes especially acute when diligence has gone as far astray as it has in the present case. Then, good faith and even honesty are subject to question.

Plaintiff Alberto Ramos was a 21-year-old college student in 1984 preparing for a career in education. He was employed on a part-time basis as a teacher's aide at Concourse Day Care Center in the Bronx, administered under the aegis of the New York City Department of Social Services' Human Resources Administration (HRA). The putative victim at the time was a five-year-old child at the Day Care Center who had a track rec-

ord of sexually provocative behavior and who had fabricated a prior claim of sexual abuse against a classmate while at the Day Care Center. Esterlita H. is her mother.

On February 19, 1984, either the child or her mother made a claim that a classmate of the child had been sexually abusing her. HRA contacted the Bronx District Attorney's office pursuant to an agreement under which HRA referred claims of sexual abuse of day care center children to the District Attorney. HRA's Confidential Investigations Unit (CIU) then conducted its own investigation. CIU interviewed teachers and administrators at the Day Care Center and also evaluated the child's own background. A pediatrician at Bronx Lebanon Medical Center, Dr. Paraclet Louissaint, examined her and, though finding the hymen slightly opened and some redness that had developed over several days, ruled out sexual abuse. He concluded that the irritation could have been caused by "almost anything, including bathroom play with another child, or * * * masturbation." Interestingly, he had not been informed that the child had a prior history of masturbation or sexual conduct. Although he referred the child to the pediatric clinic for further examination, it was done only at the mother's insistence that the child be examined further. The medical records indicate that a Dr. Annette Vasquez examined the child a couple of days later, but neither Dr. Vasquez nor anyone else ever contacted Dr. Louissaint to discuss the case. HRA, which, in its notes and reports, indicated that the child was unusually sexually provocative and precocious for her age, exposed herself often and masturbated openly in class, acted out intercourse with dolls and described sexual acts she claimed to have seen on television, also noted that she had initially denied any sexual abuse. HRA found that the charge was not credible and communicated this finding to the District Attorney, with the result that further action was not then taken.

Shortly afterward, though, in March 1984, the child's mother reported that the child now claimed that someone named "Alberto" was the perpetrator of the sexual abuse. The mother reported that the child had claimed that during nap time, "Alberto" took her into the bathroom, placed tape on her mouth, exposed himself to her, put his finger into her vagina and tried to insert his penis. Plaintiff was then drawn into the investigation.

An HRA caseworker, Irene Jarvis (Jarvis), and her supervisor, Robert Wilson (Wilson), investigated. Jarvis, after a detailed investigation, prepared a handwritten report conclud-

ing that there was no credible evidence to support the child's claim. However, it appears that at the direction of Pauline Phillips, Director of HRA CIU, who did not conduct any interviews herself, certain exculpatory information was deleted and the report was revised to a finding that the claim of sexual abuse was "indicated." A final report prepared to that effect was sent to the New York State Department of Social Services (DSS) and to the District Attorney. Critical exclusions of exculpatory information from this report, which are apparently unexplainable in terms of the normal operations of the HRA office, form the gravamen of this case. Testimony by HRA personnel, including Frank D'Antonio, a CIU-District Attorney liaison, makes clear that all relevant information, inculpatory as well as exculpatory, was required by HRA policy to have been timely provided to the District Attorney insofar as HRA recognized that it had a bearing on the criminal investigation.

In the final report based on the transcription of handwritten notes, certain relevant items found in HRA's files were omitted: that the child had been seen by staff masturbating "openly and often"; that she "pulls down her clothes in the bathroom and invites other children to look"; and that the week prior to the handwritten report being prepared, she "was seen using two dolls in sex play." In his 1997 deposition, Wilson testified that he did not know why this information had been deleted from the final report. Additionally, other items included in the report had an uncertain provenance, in that they were not drawn from Wilson's notes and documentation apparently was not in the file. Wilson surmised that it was possible that an interview or interviews with the child might have been taped, but the tapes were no longer in the file. This information, obviously, should have been significant for investigative purposes at a point in time at which the perpetrator, if, in fact one existed, was being sought, but innocent parties should have been cleared.

Other critically important information also apparently was omitted from the final report sent to DSS and the District Attorney. For instance, Wilson recalled that plaintiff's skin color was "between light and medium complected," yet the child had described the supposed molester's "peanuts"—which Wilson understood to mean penis—as "big and black." Though found in HRA memoranda, this information apparently was omitted from the report and was not provided to the District Attorney when the referral was made. Elsewhere, when asked what plaintiff had done to her, the child stated that "he taped

my mouth." When asked what else he had done, she responded "nothing. He taped my mouth." This, too, apparently was omitted. The file also contained the child's prior claim that another child, "Ephraim," had touched her vagina, but this information, too, apparently was omitted from the report sent to DSS and the District Attorney. Also, information that the child had watched sexually explicit television and movies apparently was omitted.

Dr. Vasquez's findings were incorporated into the report, and she eventually testified for the prosecution at trial after plaintiff was charged. She concluded that sexual abuse had occurred. However, she formed conclusions without having the benefit of reviewing information such as Dr. Louissaint's report, based in part on a physical examination, finding that no molestation had occurred. Similarly, Dr. Vasquez apparently had never been informed of HRA's findings that this child, in fact, was extraordinarily precocious in these matters, or that she had fabricated a prior claim.

The New York City Police Department (NYPD) assigned Detective Martin Roos to investigate this matter. While he interviewed Jarvis and Christina Gonzalez (plaintiff's supervisor), his report did not note their exculpatory statements. The investigation was later turned over to Detective Sean O'Toole. He also interviewed staff members, and parents who had been in the classroom around the time of the alleged assault who told him that they did not witness any abuse or see the child acting upset. Detective O'Toole failed to include their statements in his report.

Plaintiff was indicted in September 1984 amidst significant media coverage directed toward this alleged pedophile employed in a day care center. Around this period of time other unrelated sexual abuse prosecutions were commenced in Bronx County, also amidst a storm of publicity. ADA Diana Farrell was assigned to the Ramos case. She did not confer with Wilson until the criminal trial neared and then requested that he deliver the entire case file. As a result of that conversation, Wilson mailed the file on May 3, 1985, but by third class mail, with the result that the file did not arrive until May 17, 1985, 11 days after trial commenced. Of course, while one may easily fault the diligence of the mailing, one may also wonder why such critically important information, which might conceivably contain exculpatory information, was requested just on the eve of trial. In any event, Wilson never followed up, never discussed the file further with Farrell, and she never turned over the file or any portions of it to the defense.

At trial, the child's grandmother testified that she had picked up the crying child from the Day Care Center on the day of the alleged rape, February 17, 1984. The Day Care Center's sign-in and sign-out book reflected that the child's aunt and not the grandmother had picked up the child, which would have had obvious impeachment value. This record was not disclosed. Dr. Vasquez testified that she formed an opinion that the child had been sexually assaulted on the basis that a five-year-old child would not possess the sexual knowledge to fabricate the molestation claim and on the basis of the evidence of vaginal irritation, which was consistent with sexual abuse. However, again, Dr. Vasquez's findings were made without existing information concerning the child's unusually advanced sexual proclivities and her tendency to masturbate, which would have provided a viable explanation for the irritation. Rather, the child's teacher now denied any knowledge regarding the child's masturbation, seemingly at odds with her own prior statements in the file and those of others to the contrary which, again, would have had obvious impeachment value. Exculpatory statements regarding plaintiff made by the child herself also were never disclosed. In fact, although Farrell had interviewed personnel at the Day Care Center, some of whom could have provided exculpatory evidence, she provided plaintiff only with the names of witnesses that she intended to call at trial—and she called no exculpatory witnesses to the stand—and she failed to provide plaintiff with any exculpatory statements from other witnesses. She concluded that information that the child was actually sexually knowledgeable prior to the alleged molestation would not exonerate the suspect and hence was not *Brady* material (*Brady v Maryland*, 373 US 83).

Dr. Louissaint, who had initially examined the child when she made the accusation against another child, submits an affidavit in connection with the present civil action, discussed *infra*, in which he states that a "female assistant district attorney" had contacted him in connection with a man accused of raping the child and that she indicated that she planned to subpoena him as a witness, but that he explained that he had ruled out sexual abuse notwithstanding the child's accusation. He was not subsequently called and, in fact, no one ever contacted him again until the current civil action.

Farrell argued to the jury the veracity of the prosecution's witnesses and the reliability of Dr. Vasquez's opinion, despite possessing ample information seriously undermining that very evidence and, as well, the integrity of Farrell's own arguments

and her entire case. Exactly why such indisputable *Brady* and *Rosario* material was suppressed, then and later, and whether the trial prosecutor acted on her own or conformed to office policy or custom, are the factual issues that still must be resolved in the present civil action.

By judgment rendered June 12, 1985, plaintiff was convicted of rape in the first degree and sentenced to 8⅓ to 25 years. Continuing to maintain his innocence, he was unsuccessful in seeking State appellate and Federal habeas relief. During this entire period, the exculpatory information at issue still was not disclosed.

In 1991, plaintiff moved pursuant to CPL 440.10 to vacate his conviction on the basis of undisclosed exculpatory evidence consisting in the main of seven documents, encompassing portions of the above-noted evidence. HRA documentation had been provided to him by an investigator hired by the City in connection with the City's defense of a civil action commenced by the child and her mother concerning this incident. By this time, plaintiff had languished in jail for seven years. His own subsequent statements amply and eloquently demonstrate just how insufferable that seven years of incarceration as a putative child sexual abuser had been. Two documents were in the Day Care Center's possession and the remaining five documents were in HRA's possession. Over the District Attorney's opposition, Justice John Collins of Bronx Supreme Court ordered a hearing in April and May 1992, at which witnesses testified that, in fact, they had disclosed exculpatory evidence to ADA Diana Farrell prior to or after the 1985 trial, a claim she denied. By that time, the materials apparently had been already returned to the agency and Day Care Center and so were not in the District Attorney's file.

In granting the motion, Justice Collins specifically found that all of this evidence had been in the possession of the District Attorney at the time of trial, that it constituted *Brady* material, that disclosure therefore had been required, but that the prosecutor unaccountably had failed to disclose it. In vacating the conviction, Justice Collins properly excoriated the District Attorney, stating that "[t]he greatest crime of all in a civilized society is an unjust conviction. It is truly a scandal which reflects unfavorably on all participants in the criminal justice system * * *. The pity is that it took seven years to reach this result." Plaintiff was released after seven years of custody on June 2, 1992. Rather than, at that time, seeking dismissal on its own motion on the basis of the belatedly

disclosed exculpatory information, the District Attorney's office pursued an appeal. We unanimously affirmed (201 AD2d 78), also finding, in an opinion by Justice Ellerin, that the materials were either *Rosario* or *Brady* or both, that the items were of particular relevance to issues at trial, that there was a significantly detrimental impact on the defense arising from the prosecutor's failure to abide by her clear and compelling legal obligations, and that if the evidence had been provided to the jury, it likely would have devastated the People's case.

In 1994, after this Court affirmed, the District Attorney finally moved to dismiss the indictment, conceding that there was no reasonable cause to continue the prosecution. Justice Collins, finding the proceeding to have been terminated in plaintiff's favor, dismissed the indictment.

Plaintiff then filed the present civil action against the City of New York and Diana Farrell, setting forth 12 causes of action asserting various due process and tort theories connected to false arrest, false imprisonment, malicious prosecution, negligence, and various civil rights violations under 42 USC § 1983. Plaintiff's causes of action as relevant to this appeal are: the fifth and sixth causes of action for malicious prosecution against the City under the principle of respondeat superior based on HRA's and the NYPD's alleged misconduct in deliberately, unjustifiably and/or in bad faith withholding exculpatory material that negated a finding of probable cause, and their negligent investigations; the seventh cause of action, under 42 USC § 1983, alleging that the City, by virtue of its failure to institute adequate policies and practices to insure that the District Attorney, the NYPD and HRA carried out and understood their constitutional obligations, was liable for the violation of plaintiff's right not to be arrested or prosecuted in the absence of probable cause. Plaintiff asserted that the District Attorney exhibited a deliberate indifference to the need to train ADAs to disclose exculpatory evidence, refrain from providing inaccurate information to Grand Juries and at trial, and to correct testimony discovered to be false; and the tenth, eleventh and twelfth causes of action, seeking to hold the City liable for its reckless or negligent failure to properly, hire, train and supervise the HRA, District Attorney and the NYPD (under § 1983) employees who were responsible for plaintiff's malicious prosecution and false arrest and imprisonment.

The City was named as a defendant by virtue of its agency relationship with the NYPD and HRA, and the District At-

torney's status as a municipal policymaker. Plaintiff asserted injuries, elaborated in the pleadings, arising from several years of sexual assaults, and verbal and physical abuse by other inmates and even by guards, the destruction of his chosen profession as a teacher, public shame, disgrace and humiliation resulting from the conviction orchestrated by the prosecutor's office, the need to pay significant legal fees in connection with his criminal defense of dubious charges, and other extensive emotional and mental pain and anguish. Farrell and various police personnel were deposed and discovery documents were exchanged. The District Attorney sought a protective order regarding discovery requests relating to the negligent supervision and section 1983 claims, which sought disciplinary records of Assistant District Attorneys working under the late District Attorney Mario Merola who had committed prosecutorial misconduct.

By order entered October 29, 1999, Supreme Court (Stanley Green, J.), denied defendants' motion for a protective order to the extent of directing that ADA Eric Warner, who had supervisory responsibilities then and later, be produced for a deposition. The court also directed that the disciplinary records of several enumerated prosecutors apparently connected with *Brady* violations be produced for an in camera inspection, but granted the motion for a protective order as to other specified items. Plaintiff appeals from this order to the extent that the protective order had been partially granted.

Defendants also moved for CPLR 3211 dismissal and, under CPLR 3212, for summary judgment dismissing the complaint on various grounds. Plaintiff cross-moved for partial summary judgment to the extent of declaring that District Attorney Mario Merola was a New York City policymaker regarding management, supervision and training of Assistant District Attorneys. Plaintiff's cross motion was granted.

The court dismissed all State law claims against the City, but denied the City's motion to dismiss as to the seventh cause of action for civil rights violations, with leave to renew upon completion of discovery. More specifically, the court dismissed the first and second causes of action against the City concerning HRA, sounding in false arrest and false imprisonment resulting from HRA's failure to turn over its complete investigatory file to the prosecution, as barred by collateral estoppel. Justice Collins, in granting defendant's CPL article 440 motion, had found that all relevant records were in the District Attorney's possession at time of trial, which the motion court

found precluded the claim that HRA had failed to turn over those records. Similar reasoning was employed to dismiss the fifth cause of action, asserted against the City, sounding in malicious prosecution by HRA. The third, fourth, and sixth causes of action against the City sounded in false arrest, false imprisonment and malicious prosecution by various NYPD personnel arising from its failure to turn over exculpatory HRA records to the prosecution, and were likewise dismissed. The motion court found these, also, to be barred by collateral estoppel on the theory that police witnesses in their depositions testified that, with a minor exception, they had had no HRA records and, that moreover, Justice Collins found that these records were in the prosecutor's possession at the time of trial.

Various 42 USC § 1983 claims were asserted against ADA Farrell as well as the City and depended on Mario Merola's status as a policymaking official, though on whose behalf he exercised responsibilities in that regard—City or State—was problematic. As noted, the court found that for present purposes, Merola acted under the guise of local, county jurisdiction, and that New York City is responsible for the acts of its constituent counties. The section 1983 claims against Merola arose from a purported pattern of *Brady* violations regarding child sex offenders. The motion court pointed out that the pattern was a sufficient predicate for maintaining the section 1983 claims against the City on the basis of Merola's conduct. The court declined to dismiss that part of the seventh cause of action asserted against New York City for the conduct of Mario Merola subject, as noted above, to renewal upon completion of discovery.

All causes of action against Farrell were dismissed. The court dismissed the section 1983 claims against Farrell in the seventh cause of action, which was grounded in the theory that she conspired with Mario Merola to do whatever was necessary, legal or not, to keep suspected child sex abusers imprisoned. In the ninth cause of action, malicious prosecution claims were asserted against Farrell, individually and in her official capacity, and against the City, under the principle of respondeat superior. The court dismissed all such claims against Farrell in her individual capacity on the basis of absolute immunity (*Ying Jing Gan v City of New York,* 996 F2d 522) and, in her official capacity, on the ground of qualified immunity, insofar as all of her acts were in furtherance of her responsibility as a prosecutor, and there was no evidence that in that capacity she acted as a policymaker.

The tenth, eleventh and twelfth causes of action, sounding in false arrest, false imprisonment and alleged malicious prosecution—all intentional torts—arose from the failure by the City's agents (NYPD, HRA and District Attorney, respectively) to adequately train and supervise. The court dismissed these claims on the grounds that a negligence theory cannot underpin an intentional tort. Moreover, the court dismissed as to the NYPD and HRA, on the basis that collateral estoppel, again, barred the claims when a judicial finding established that the relevant records were, in fact, turned over to the District Attorney at the time of trial.

Plaintiff, as limited by his brief, appeals to the extent that the order dismissed as against the City the causes of action for malicious prosecution (fifth and sixth causes of action) and the negligent failure to properly hire, train and supervise the HRA, District Attorney and NYPD employees (tenth, eleventh and twelfth causes of action), but does not appeal with respect to dismissal of the false arrest/false imprisonment claims against the City or Farrell. The City cross-appeals to the extent the order granted summary judgment to plaintiff finding that Merola was a New York City policymaker for these purposes, and to the extent that plaintiff's section 1983 claims (seventh cause of action) against the City were not dismissed.

■ We conclude that the City is not presently entitled to summary judgment on the claim of malicious prosecution based on HRA's alleged misconduct in withholding exculpatory material and its negligent investigation, or on the section 1983 claim predicated on the District Attorney's alleged policies or customs.

Initially, the motion court found, without elaboration, that the fifth cause of action, alleging malicious prosecution by HRA, was barred by collateral estoppel. This finding was made in the context of the court's more extensive discussion of the false arrest/false imprisonment claims against the City in the first and second causes of action arising from HRA's alleged failure to turn over exculpatory information to the District Attorney. However, Justice Collins' findings that the District Attorney possessed HRA's records at the time of trial does not bear on the malicious prosecution claim against HRA arising from HRA's internal investigation and what evidence it actually recorded but failed to turn over to the District Attorney prior to prosecution. Despite its finding that collateral estoppel applied as to the malicious prosecution claim, the motion court made no findings directly pertinent to that claim in the fifth cause of action. Nor is the conclusion sound.

Plaintiff contends that the court erred in collaterally estopping litigation of the malicious prosecution claim against HRA as to a broad range of injuries suffered prior to the District Attorney receiving the exculpatory evidence, including the media firestorm, the wrongful indictment, pre-trial incarceration, legal fees, and the humiliation and anxiety caused by this criminal trial, as well as all injuries suffered after HRA's delivery of documents, on the basis that the mere delivery did not abrogate the causative link between its prior misconduct and the resulting injuries. As such, plaintiff contends that a jury issue of, *inter alia*, proximate causation is presented regarding the City's liability on the basis of HRA's catalytic role in the criminal investigation and HRA's related improper conduct.

The City contends, though, that the manner in which plaintiff frames the argument is flawed in that a malicious prosecution claim cannot be asserted insofar as HRA did not commence the prosecution, which, supported by probable cause, was, by definition, not malicious. The City, relying on our reasoning in *Present v Avon Prods.* (253 AD2d 183 [employer merely turned over to police results of internal investigation regarding theft; no suppression of exculpatory evidence, and no importuning of prosecution], *lv dismissed* 93 NY2d 1032), contends that HRA never played an active role in the subsequent prosecution but only limited its role to reporting the crime, indicating, on the basis of credible evidence, that abuse was "indicated," and that the finding of probable cause was only made by the District Attorney. Moreover, the City argues, the action of the Grand Jury was not the action of HRA, and, relying on *Gisondi v Town of Harrison* (72 NY2d 280, 283-284 [although plaintiff established alibi and Grand Jury did not indict, police were not at fault in view of rape victim's identification]), argues further that the indictment created a presumption of probable cause rebuttable only by a demonstration of fraud, perjury, suppression of evidence or other police conduct taken in bad faith, purportedly not present here. Since probable cause existed, the argument continues, no inference of malice may be drawn against HRA (*Present, supra*). The mere fact of a disagreement among HRA personnel, as urged by the City, would not itself evince bad faith by HRA. Finally, the City argues that HRA was under no duty to plaintiff to disclose its entire file to the District Attorney absent a request for it, or to subsequently provide corrective information when available. Of course, as plaintiff points out, the City relied solely on collateral estoppel, rather than these present ad-

ditional arguments, in seeking dismissal before the motion court.

We agree with plaintiff that the fifth cause of action, sounding in malicious prosecution arising from HRA's failure to timely and diligently disclose exculpatory evidence, pleads a valid claim under these circumstances and raises factual issues precluding summary judgment (*see, Parkin v Cornell Univ.*, 78 NY2d 523, 529 [factual disputes regarding basis for probable cause in malicious prosecution action]; *see generally*, discussion in *Komlosi v Fudenberg*, 2000 US Dist LEXIS 4237, 2000 WL 351414 [SD NY, Mar. 31, 2000] [jury verdict for plaintiff; defendant encouraged false accusation]; *cf., Paul J. G. v County of Nassau*, 274 AD2d 414 [directed verdict for plaintiff against defendant county on basis of District Attorney's conduct]).

To state a claim for malicious prosecution, the plaintiff must prove the initiation or continuation of an action against him; the termination of the proceeding in his favor; the absence of probable cause to commence the proceeding; and actual malice as a motivation for the defendant's actions (*Colon v City of New York*, 60 NY2d 78, 82; *Broughton v State of New York*, 37 NY2d 451, 457 [also discusses malicious prosecution as distinct from false arrest], *cert denied sub nom. Schanbarger v Kellogg*, 423 US 929). Even if the exculpatory materials, initially withheld, had been provided during a trial resulting in plaintiff's acquittal, he still would have been entitled to bring an action for malicious prosecution to that point based on HRA's apparent withholding of evidence that negated probable cause in the first instance. As such, even though Justice Collins, in deciding the CPL 440.10 motion, found that HRA had belatedly delivered the exculpatory materials to the District Attorney, so that the District Attorney then had the undisclosed *Brady* material during the trial, this circumstance does not thereby dispose of the elements of the malicious prosecution claim regarding HRA's prior conduct. On the contrary, Justice Collins granted the article 440 motion without making a finding regarding HRA's motivations and conduct prior to its delivery of the *Brady* materials, and without finding that the District Attorney's non-disclosure was the exclusive cause of plaintiff's injuries. It follows, then, that collateral estoppel does not apply under the circumstances of this case to bar plaintiff's prosecution of his malicious prosecution claim predicated on HRA's conduct.

The issue of whether the City is liable for malicious prosecution based on HRA's conduct presents questions of fact regard-

ing the requirements of initiation of prosecution, probable cause, and the existence of malice. Regarding the initiation of the prosecution, HRA informed the District Attorney that sexual abuse was indicated insofar as Dr. Vasquez reported that the child had been abused. However, the record also shows that despite HRA's admission that it was required by its own policy to provide whatever contrary information was in its possession, including Jarvis' investigatory conclusion that the child's claim lacked merit, and to have provided exculpatory documentation, it apparently failed to do so. Plaintiff was not under investigation until HRA targeted him and then failed to utilize evidence apparently exonerating him, so that HRA can hardly claim to have been an uninvolved passive player when the investigation leading to the prosecution was commenced. Hence, whether or not HRA itself was the prosecutorial agency is immaterial under these circumstances (*Urbank v Big Scott Stores Corp.*, 92 AD2d 665 [no evidence that law enforcement authorities knew of alleged theft; prosecution initiated on complaint of defendant store]). To the contrary, the record reflects that HRA was well aware that its internal investigation, concluding with its reports targeting plaintiff, but omitting information exonerating him, would directly shape the District Attorney's evaluation of the case and motivate the District Attorney to prosecute plaintiff. Hence, the record raises the factual issue whether HRA selectively reported misleading information and intentionally withheld material and relevant exculpatory information, and, by doing so, whether HRA personnel acted in a catalytic role and directly prompted commencement of the criminal prosecution against plaintiff.

Turning next to whether HRA's conduct proximately caused the injuries in the context of a malicious prosecution claim, here, too, the record presents factual issues which the current posture of this case leaves unresolved. In the context of a malicious prosecution action, probable cause "consists of such facts and circumstances as would lead a reasonably prudent person in like circumstances to believe plaintiff guilty" (*Colon, supra,* at 82). Although a mistake of fact as to the identity of the criminal might not void probable cause, a failure to make further inquiry when a reasonable person would have done so may evidence a lack of probable cause (*Colon, supra,* at 82). New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court, or holding back information that might have affected the results, with that defendant's initiation of a

malicious prosecution (*Hopkinson v Lehigh Val. R. R. Co.*, 249 NY 296, 300; *see also, Morillo v City of New York*, 1997 US Dist LEXIS 1665, 1997 WL 72155 [SD NY, Feb. 20, 1997]; *cf., Du Chateau v Metro-North Commuter R. R. Co.*, 253 AD2d 128). The record here, for the present motion, sufficiently supports plaintiff's claim, for purposes of denying defendant's motion, that witnesses had not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they had misrepresented or falsified evidence, and that they sufficiently withheld evidence or otherwise acted in bad faith, which, if proved, would overcome the presumption of probable cause. At this stage of the proceeding, it cannot be found as a matter of law that defendant prosecuted plaintiff with probable cause and without malice (*Morillo, supra*; *compare, Colon, supra* [witnesses merely had different perception; no evidence of bad faith]; *see, Munoz v City of New York,* 18 NY2d 6). Although the nature and cause of the District Attorney's *Brady* violation may ultimately affect the City's civil liability, the District Attorney's role in the prosecution does not, per se, insulate the City from liability arising from HRA's alleged conduct in knowingly and maliciously providing false or misleading information, if proved (*Babi-Ali v City of New York*, 979 F Supp 268, 276; *Morillo, supra*). The City's reliance on *Akande v City of New York* (275 AD2d 671), is misplaced. There the United States Customs Department provided credible information leading to the arrest; only later was it discovered that the package underlying the arrest in fact contained no contraband. That was a case of late discovery, rather than late disclosure or even non-disclosure. Hence, there was no malice. In the present case, the record for present purposes supports the claim that HRA had and knew of significant exculpatory information prior to its referral of the matter to the District Attorney with HRA's concomitant finding that a charge of child sexual abuse was indicated.

Regarding the element of malice, a plaintiff need not demonstrate the defendant's intent to do him or her personal harm, but need only show a reckless or grossly negligent disregard for his or her rights. This may be manifested in an egregious deviation from proper investigative procedures (*Hernandez v State of New York*, 228 AD2d 902, 904) or by initiation of the prosecution notwithstanding the total absence of probable cause (*Martin v City of Albany*, 42 NY2d 13, 17) as just defined (*see, Colon, supra*, at 82). Actual malice, in fact, is seldom shown by direct evidence of an ulterior motive, but is usually

inferred from the facts and circumstances of the investigation. (*Martin, supra*, at 17.) Obviously, then, this record presents issues of fact arising from HRA's retention or non-disclosure of exculpatory material. Although the City relies on *Lauer v City of New York* (95 NY2d 95), that case is distinguishable in that the CIU-District Attorney liaison in the present case has acknowledged that under existing policies HRA was obliged to turn over exculpatory information, but unaccountably it did not.

Accordingly, we reinstate the fifth cause of action asserting malicious prosecution against the defendant City as a consequence of HRA's conduct.

■ Plaintiff argues that the IAS court's determination was similarly in error as to the NYPD. He contends that the sixth cause of action was not predicated only on the NYPD's failure to turn over HRA documents, but also encompassed the NYPD's withholding of evidence in a grossly negligent investigation, which caused the initiation of the malicious prosecution and the significant post-arrest injuries even prior to the District Attorney's receipt of exculpatory information (*cf., Hernandez v State of New York*, 228 AD2d 902, 904; *cf., Maxwell v City of New York*, 156 AD2d 28). Plaintiff's argument, though, does not hold up to scrutiny.

The NYPD merely furnished information under direction of the District Attorney. There is no allegation that officers offered perjured statements or engaged in other conduct that would support a finding that they actively instigated the prosecution (*compare, Maxwell, supra*). The NYPD was not provided with the exculpatory materials in HRA's files, and it did disclose its own investigatory file to the District Attorney. There is no plausible indication that the NYPD deviated from customary practices governing the investigation of criminal cases (*cf., Gisondi, supra*). To whatever extent individual officers failed to follow some leads or failed to accurately take notes evinces only carelessness rather than malice (*Ellsworth v City of Gloversville*, 269 AD2d 654; *Hernandez, supra*; *Higgins v City of Oneonta*, 208 AD2d 1067, 1069, *lv denied* 85 NY2d 803; *Gisondi, supra*).

■ Nor are the malicious prosecution claims in the tenth through the twelfth causes of action, premised on negligent hiring, training and supervision, sustainable. The motion court correctly concluded that these negligence theories do not support the intentional tort (*Pandolfo v U.A. Cable Sys.*, 171 AD2d 1013; *compare, Haddock v City of New York*, 75 NY2d 478).

■ Turning to the 42 USC § 1983 claims, that section provides that "[e]very person who, under color of any statute * * * subjects, or causes to be subjected, any citizen of the United States * * * to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." While common-law torts may parallel constitutional claims, only the violation of a constitutional right is actionable under section 1983. Nevertheless, there is some overlap in the analysis of the different legal theories under the circumstances of this case. In order to maintain a section 1983 action predicated on the tort of malicious prosecution, a plaintiff must show sufficient restraint on liberty to implicate his Fourth Amendment rights, that the defendant initiated or maintained the prosecution against the plaintiff without probable cause, that the defendant acted maliciously, and that the proceeding was terminated in the plaintiff's favor (cf., Oathout v Decker, 2000 US Dist LEXIS 12001 [SD NY, Aug. 21, 2000]). Although there is no liability arising solely under respondeat superior (City of Canton v Harris, 489 US 378, 385; Monell v Department of Social Servs., 436 US 658, 690-691) when a municipal employee acts in violation of a person's Federal civil rights pursuant to municipal policy or custom, a different issue is presented. The issue is not whether the employee acted improperly, but whether the municipality acted improperly (Walker v City of New York, 974 F2d 293, 296, cert denied 507 US 961 [applying Monell, supra]). Then, the municipality may be exposed to section 1983 liability (see, Monell, supra). The plaintiff must show the existence of a constitutionally offensive policy or custom and its causal connection to the injury (Board of County Commrs. v Brown, 520 US 397). When the challenged action is by an official acting under guise of official policy, the question is whether that official had authority to exercise and did exercise final policy-making in that area (cf., McMillian v Monroe County, 520 US 781, 785-786 [Alabama counties lacked law enforcement authority, hence sheriff not a county policymaker; county not liable for sheriff's acts]; Jett v Dallas Ind. School Dist., 491 US 701, 737), which requires, in the first instance, reference to State law (McMillian, at 786).

The policies in issue here concern the District Attorney. Courts recognize that a New York District Attorney's role in the prosecution of criminal cases is unique (see, Baez v Hennessy, 853 F2d 73, 76, cert denied sub nom. Baez v County of Onondaga, 488 US 1014 [and citations in discussion]). The threshold issue to be determined, then, is whether the District

Attorney, who enjoys immunity in this action, acted as a policymaker for defendant City of New York so as to bring the City within the ambit of a section 1983 claim. The claim here lies not just in the fact of prosecution, in which role the District Attorney acts as representative of the State in prosecuting State law violations (*cf.*, *Baez*, *supra*), but in the District Attorney's managerial functions relating to supervision and training, especially pertaining to *Brady* disclosure. When a District Attorney evinces a pattern of ignoring law enforcement improprieties and misconduct (*Gentile v County of Suffolk*, 926 F2d 142), or fails to train and supervise ADA's regarding *Brady* and other legal obligations (*Walker v City of New York*, 974 F2d 293, *cert denied* 507 US 961), such management failures correlate with defects in the District Attorney's role as a local policymaker (*Walker*, *supra*; *accord Ying Jing Gan*, *supra*, at 536). This distinction has continued in the Second Circuit (*see*, *e.g.*, *Myers v County of Orange*, 157 F3d 66, *cert denied* 525 US 1146), subsequent to the United States Supreme Court's *McMillian* (*supra*) ruling (regarding Alabama counties), upon which the City relies to argue that the District Attorney is a State actor only. Hence, following Second Circuit precedents, where prosecutors, pursuant to policy or custom, conceal exculpatory evidence and commit other wrongs in order to secure a conviction, liability rests with the county (or for New York City's constituent counties, the City [*Walker*, *supra*, at 301]) rather than with the State (*Gentile*, *supra*; *Walker*, *supra*; *Myers*, *supra*) and may be asserted under section 1983 (*Babi-Ali*, *supra*). This conclusion is also firmly grounded in New York law. After all, a District Attorney historically has been categorized as a local, rather than a State, officer (*see*, Public Officers Law § 2), which is unremarkable in that the District Attorney is elected and compensated by the county's voters and enjoys no extra-county jurisdiction (*Fisher v State of New York*, 10 NY2d 60) as a result of which a District Attorney's torts are the torts of the county rather than of the State (*id.*; *Claude H. v County of Oneida*, 214 AD2d 964; *Morris v City of New York*, 198 AD2d 35; *Whitmore v State of New York*, 55 AD2d 745, *lv denied* 42 NY2d 810; *Fonfa v State of New York*, 88 Misc 2d 343). New York City law identifies the District Attorney as a City official (Administrative Code of City of NY § 3-601 [b]).

Notably, the official in question need not be a municipal policymaker for all purposes. Rather, with respect to conduct challenged, he must be "responsible under state law for making

policy in *that area* of the city's business" (*City of St. Louis v Praprotnik*, 485 US 112, 123 [emphasis in original]). We examine only the manner in which the District Attorney's office, management and supervision allegedly effectively promulgated policy amounting to deliberate indifference to, and impacting upon, this plaintiff's Federal civil rights within the County of Bronx (*Walker, supra*). As such, the section 1983 claim may be maintained against the City for the conduct of the District Attorney's office, insofar as the District Attorney acted as a New York City policymaker.

In order for a policymaker to be liable for supervisory defects, it must be shown that the policymaker knows to a moral certainty that employees will confront a given situation; that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights (*Walker, supra*, at 297-298) and that the extent of such managerial inadequacies manifests "deliberate indifference" to the Federal constitutional rights of persons with whom the employees interact (*City of Canton, supra*, at 388). The policy need not be an intentional one to deprive a criminal suspect of his or her constitutional rights (*Fiacco v City of Rensselaer*, 783 F2d 319, 326, *cert denied* 480 US 922). Deliberate indifference may be shown by the policymaker's choice from among various alternatives, not to fully train employees when "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" (*City of Canton, supra*, at 390). Similarly, the standard may be met circumstantially by evidence that the municipality had notice of, but repeatedly failed to make any meaningful investigation into, charges that employees were violating citizens' constitutional rights (*Ricciuti v N. Y.C. Tr. Auth.*, 941 F2d 119, 123). Again, though, the caution is necessary that our present ruling is no broader than our finding that the unique circumstances of this case present a factual issue whether purported systemic malfunctions in the District Attorney's office during that period of time violated plaintiff's constitutional rights.

Plaintiff has adequately pleaded and made a sufficient threshold showing that systemic failure rather than merely

Farrell's conduct caused the constitutional harm here. More specifically, plaintiff pleaded in the seventh cause of action, sounding in the City's section 1983 violation, that his wrongful conviction and related injuries were directly and proximately caused by the District Attorney's office and thereby resulted from the defendant City's "deliberately inadequate" policies, practices and customs concerning "disclosure to the appropriate parties, during criminal * * * prosecutions, of all material evidence favorable to the * * * defense," and "refraining from offering or giving false, inaccurate, incomplete or misleading testimony * * * at trial, or from making false or misleading argument to the * * * petit jury * * * correcting such testimony or argument after it is discovered to be false, inaccurate, incomplete or misleading." Plaintiff also complains of the policymaker's defective policies in failing to seek vacatur of the conviction based on the violations once it became apparent that the case was built on false and misleading information (*see generally*, *Darden v Wainwright*, 477 US 168, 181-183; *United States v Vozzella*, 124 F3d 389, 392 [prosecution's misstatement of evidence, ignoring exculpatory evidence, amounted to falsity; Fourteenth Amendment violation when prosecutor fails to correct results of false evidence]; *People v Novoa*, 70 NY2d 490, 496-498 [prosecutor's obligation to correct testimonial misstatements invokes fair trial guarantees]).

Further, plaintiff alleged in this cause of action that his *Brady* rights were violated as a consequence of the District Attorney's management policies and practices and that the City's liability arose from the failure to "properly instruct, train and/or supervise employees (including * * * Farrell and others involved in the investigation and prosecution of plaintiff) in such matters." Plaintiff also claimed that the District Attorney, and accordingly the City, "perpetuated, or failed to take steps to terminate, said * * * practices and/or customs, did not discipline or otherwise properly supervise the individual prosecutorial * * * personnel who allowed and engaged in them, did not effectively instruct, train and/or supervise such personnel (including defendant Farrell) with regard to the proper constitutional and statutory requirements in the exercise of their authority, but instead sanctioned" the offending practices and policies with a "deliberate indifference" to their effect on individual constitutional rights.

Plaintiff buttresses these allegations in the pleadings with record support from which a jury could reasonably infer a pattern. This includes Farrell's EBT in which she testified that

her decisions and conduct in plaintiff's criminal case conformed to the training she had received regarding *Brady* issues. Thus, assuming the veracity of this testimony, a jury could conclude that such training, and the lead she took from possible official policy tolerating or acquiescing in such misconduct (*see, Fiacco, supra*, at 328, *cert denied* 480 US 922; *Vann v City of New York*, 72 F3d 1040, 1051), led her to withhold exculpatory information that should have been disclosed under the *Brady* doctrine. A jury could also reasonably find such an inference further supported by the District Attorney's strident opposition to the CPL 440.10 motion as well as the District Attorney's failure to discipline Farrell for the *Brady* violation, the latter factor further supported by ADA Borger's testimony that he was unaware of any disciplinary policy regarding *Brady* violations nor, in fact, of any occasion when a prosecutor was disciplined for *Brady* or other violations. Plaintiff also illustrates the claim that his treatment was consistent with a more general policy by enumerating 10 other *Brady* reversals. The City argues this is inconsequential when measured by the number of annual prosecutions and that, hence, it does not constitute a pattern. However, the City's objections do not hold for purposes of summary dismissal. Rather, the City failed to provide evidence as to the number of annual prosecutions that typically present *Brady* issues, nor does it account for *Brady* violations that go undiscovered, or, if discovered, *Brady* violations that, because of the circumstances of individual cases, do not warrant reversal. In any event, even when nine *Brady* violations were presented in support of inadequate supervision claims (*Babi-Ali, supra*), or, by comparison, seven claims over five years that police misconduct was inadequately investigated (*Fiacco, supra*), sufficient patterns of deliberate indifference were made out. There is no reason to reach a different result for the present purpose of deciding this dismissal motion. Nor would allegations of negligence in the complaint nullify plaintiff's right to plead and prove alternative theories of harm, such as the present section 1983 claim. As noted above, we are making no substantive findings on the merits of this case. We find only that plaintiff's pleadings and proof are adequate to defeat defendant's CPLR 3211 and 3212 dismissal motion concerning the legal claims outlined above.

■ Finally, we modify the discovery order to expand the scope of discovery to various items potentially necessary to plaintiff's section 1983 claims. In view of the Federal constitutional gravamen of section 1983 cases, we are governed by

Federal law in determining discovery motions notwithstanding possibly more restrictive State law norms, especially involving law enforcement records (*Svaigsen v City of New York*, 203 AD2d 32; *King v Conde*, 121 FRD 180). Federal law has allowed in such civil rights cases for much more liberal discovery of recollections and documentation of prior complaints and police history, subject to appropriate redaction to protect informers or privacy (*King, supra*, at 198; *accord Mann v Alvarez*, 242 AD2d 318). Federal discovery, generally, pertains to non-privileged information that bears on the subject matter of the dispute and need not even be admissible itself as evidence if it "appears reasonably calculated to lead to the discovery of admissible evidence" (Fed Rules Civ Pro rule 26 [b] [1]). Plaintiff's theory of section 1983 liability relies in part on the contention that the District Attorney's office exhibited a pattern of conduct, especially but not limited to *Brady* violations, that deprived him of his Federal constitutional rights. The theory has support in precedent (*see, Walker, supra* [Brooklyn District Attorney's history of *Brady* violations valid basis for section 1983 liability]; *accord Babi-Ali, supra*, at 274 [Queens District Attorney's history of *Brady* violations, and citations therein]). Hence, plaintiff should be entitled to relevant information cited in his second supplemental demand for discovery and inspection, after in camera inspection and redaction by the court if necessary, pertaining to the alleged pattern including other *Brady* violations, including information relating to internal discipline or other remedial action taken in that regard, matters directly relevant to plaintiff's theory of liability.

Accordingly, the order of the Supreme Court, Bronx County (Stanley Green, J.), entered November 22, 1999, which, to the extent appealed and cross-appealed from as limited by the briefs, granted defendant City's motion for summary judgment insofar as to dismiss plaintiff's claims for malicious prosecution predicated on the alleged wrongful conduct of the HRA and the New York City Police Department, but denied so much of defendant City's summary judgment motion as sought dismissal of plaintiff's claim pursuant to 42 USC § 1983 premised on the policies and practices of the former District Attorney with respect to his office's discharge of its obligations under *Brady*, should be modified, on the law, to reinstate plaintiff's fifth cause of action against defendant City for malicious prosecution premised on the alleged wrongful conduct of HRA in withholding exculpatory information, and otherwise affirmed, without costs. Order, same court and Justice, entered October

29, 1999, granting the City a protective order limiting plaintiff's right to obtain disciplinary and other records from the District Attorney's office pertaining to *Brady* errors, should be modified, on the law, to deny defendant's preclusion motion as to items 3 (c), 3 (d), and 4, after in camera review and redaction if necessary to shield confidential and privileged materials, and otherwise affirmed, without costs.

ROSENBERGER, J. P., ELLERIN, RUBIN and BUCKLEY, JJ., concur.

Order, Supreme Court, Bronx County, entered November 22, 1999, modified, on the law, to reinstate plaintiff's fifth cause of action against defendant City for malicious prosecution premised on the alleged wrongful conduct of the Human Resources Administration in withholding exculpatory information, and otherwise affirmed, without costs. Order, same court and Justice, entered October 29, 1999, modified, on the law, to deny defendant's preclusion motion as to items 3 (c), 3 (d), and 4, after in camera review and redaction if necessary to shield confidential and privileged materials, and otherwise affirmed, without costs.