Roberts v City of New York (2019 NY Slip Op 02177)





Roberts v City of New York


2019 NY Slip Op 02177


Decided on March 21, 2019


Appellate Division, First Department


Tom, J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 21, 2019
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

John W. Sweeny, Jr., J.P.
Peter Tom
Ellen Gesmer
Jeffrey K. Oing
Anil C. Singh JJ.


6798/07 7336 

[*1]Wayne Roberts, Plaintiff-Appellant,
v
The City of New York, et al., Defendants-Respondents.



Plaintiff appeals from an order of the Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about May 23, 2017, which, to the extent appealed from as limited by the briefs, granted defendants' motion for summary judgment dismissing plaintiff's claims for false arrest and imprisonment and malicious prosecution.




McManus Ateshoglou Aiello & Apostolakos PLLC, New York, (Steven Ateshoglou of counsel), and The Law Office of John R. Kelly, Monticello (John R. Kelly of counsel), for appellant.
Zachary W. Carter, Corporation Counsel, New York (MacKenzie Fillow and Jane L. Gordon of counsel), for respondents.



TOM, J.


This action to recover damages for false arrest and imprisonment and for malicious prosecution arose from plaintiff Wayne Robert's arrest and prosecution for the murder of Jamie Richetti, who was shot and killed at a social gathering on November 3, 2002. Plaintiff had been indicted by a grand jury on August 14, 2003 on two counts of murder in the second degree and other charges, and a criminal jury trial followed. Ultimately, plaintiff was acquitted on February 2, 2006.
Certain facts pertinent to the shooting are undisputed. For the subsequent civil action, plaintiff's strategy has focused on disputing the identification of him as the shooter. The record, including numerous police reports and statements by witnesses, reflects that the shooting outside of a well attended social event caused significant confusion as witnesses were alerted from various vantage points while many attendees remained inside. Some participants in a physical confrontation preceding the shooting apparently had not been invited and likely were unknown [*2]by attendees. Nevertheless, plaintiff's various attempts to dispute his identification as well as disparage the credibility of police and identification witnesses do not withstand a close analysis with respect to establishing the requisite elements of the civil claims. When the speculative challenges to probable cause and the propriety of the prosecution are cleared away, we are left with a record of the criminal investigation and prosecution that is factually compelling, warranting dismissal of the civil claims relevant to this appeal.
On November 2, 2002, the victim, Richetti, had attended a birthday party in the community center at the Soundview Housing Projects in the Bronx. At around 1:00 a.m. a large fight began outside the center, and at least one person fired a gun. Richetti was shot in the head and died in Jacobi Hospital a few days later.
Police officers responded to the scene and took statements that did not, however, ripen at that time into strong leads as to the identification of the shooter. Detective Gilbert Ramirez of the 43rd precinct was assigned to investigate. The Unusual Occurrence Form prepared at the precinct following the shooting reflected that the victim had been shot twice in the head, that three .38 caliber copper jacketed spent shell casings were recovered nearby and that a witness, George Lopez, stated that four black men wearing black clothing had been involved and that the group had been unknown to him as well as the victim. A report dated November 4, 2002 reflected that the victim's father called Ramirez from the hospital and stated that he had heard that "Pee-wee," who possibly lived in the "Castlehill projects," might have been responsible for the shooting.
The DD-5 report reflected that Angel Milan, the victim's friend who had attended the party in the company of the victim and George Lopez, related in his statement at the precinct on November 14, 2002 that someone named "Terry," who lived in the same building as the victim, was fighting with another individual, and that the victim also began to fight that unknown person. Milan related during the precinct interview that during the scuffle, another "kid" fired shots in the air, causing people to scatter, but when the victim kept fighting, his antagonist broke away and also pulled out a gun. As the victim turned to run, Milan related that he, himself, ducked behind a car, from where he heard several shots being fired. Milan stated that when he looked out, he saw the victim bleeding on the ground and the shooter running with others towards Story Avenue. Milan described the person wielding the gun as a black male with dark skin and short hair about 5'10" to 6' in height and weighing approximately 170 pounds, wearing a black jacket with a hood. Milan also related that, upset, he was walking home rapidly afterward and came upon Terry who was saying on his cell phone, "You killed one of mine, now one of yours got to go."
On May 2, 2003, Detective Ramirez arrested Harry Adams in connection with an unrelated crime. At the time of his arrest, Adams was at his sister's house with his pregnant 17-year-old girlfriend, Crystal Westbrook, who was also brought to the precinct. According to Detective Ramirez, police officers interviewed Adams, who said he knew who was responsible for the shooting at the community center and that he was looking for a deal with the District Attorney's office. In his signed statement on May 12, 2003, Adams related that he had been invited to the party and was there with Westbrook when some kind of "fight broke out" in the community center. At one point an argument broke out with "Wayno (Pee-Wee)" which he heard was "over a chain snatch," and it resulted in a "couple of guys" having fist fights. He saw Wayno pull out a handgun and fire a shot at the crowd, and saw somebody directly in front of Wayno drop to the ground. Wayno was about to shoot again, when he was grabbed and his arm was pushed into the air, and then some others began to fire shots. Wayno then ran away. Adams had known Wayno for years, and described him as "crazy," "very intoxicated," "a dangerous dude" and wearing a "box" jacket at the time of the shooting. "I saw Wayno pull out the gun and shoot the kid, no reason whatsoever."
Following Adams's interview, the police questioned Westbrook. She told police that she was also at the party, saw two guys fighting over a "chain snatch," and the fighting continued outside. She saw a black man who she knew as Wayno pull out a gun, point it at another guy, and fire one shot. She also saw the victim fall to the ground and not move again. At that point, she related, more people began to shoot and run in various directions, and Wayno ran away.
Detective Ramirez showed both Adams and Westbrook a photo array from the NYPD's Photo Imaging System that included a photo of plaintiff. He asked each of them if they recognized anyone as "Pee-Wee" or "Wayno," and they both identified plaintiff. Detective Ramirez said that they informed him they knew him because they grew up together in the same neighborhood.
Based on these statements, the DA's office authorized the police to arrest plaintiff. Upon his arrest, plaintiff spontaneously said he was the victim at the party, where he was punched in the face. Plaintiff then gave written statements saying that he was at the community center party on the night of the shooting, got into a fight inside the hall over a girl, and was sucker punched, causing a gash in his eyebrow. He claimed he went home to clean up and stayed there.
Thereafter, in August 2003, a grand jury indicted plaintiff on two counts of murder in the second degree, one count of manslaughter in the first degree, and one count of criminal possession of a weapon.
Sometime in July 2005, before the criminal trial, Westbrook informed the Bronx DA's Office that plaintiff had called her and that she was recanting her statement and grand jury testimony. ADA Christine Scaccia asked the court to declare Westbrook an unavailable witness due to plaintiff's misconduct and to permit her grand jury testimony to be admitted at trial. The court appointed an attorney for Westbrook, and a hearing on this issue was held on January 11, 2006.
At the hearing, Detective Ramirez testified that a suspect's name, "Pee-wee," had been "floating around." Ramirez then testified to the statements previously provided by Adams and Westbrook. Ramirez testified that whereas Adams was in the precinct because he was being arrested, Westbrook explained that she was there because she "had nowhere to go" but that she was kept in a room separate from Adams. After Adams provided his statement, Westbrook was interviewed separately from Adams, and she provided the statement related above. Each statement was documented in a DD-5. Only after Westbrook provided a statement were she and Adams allowed to be together for about two minutes while they shared a cigarette. With respect to Westbrook's recantation, Ramirez testified that Westbrook had informed him during July 2005 that someone had gone to her building looking for her because she was a witness to a homicide. Then, after plaintiff contacted her by phone, she told Ramirez that she had "made it all up" to help Adams avoid jail. Ramirez testified that Westbrook claimed to have been left alone with Adams for a lengthy period of time in the precinct, during which time Adams told her what to say. Ramirez testified that this was inaccurate, since Adams, who was secured in an interview room as an arrestee, and Westbrook, who was in his office, had never been left alone prior to their separate statements.
Westbrook testified at the hearing that she had known plaintiff, whom she identified in court, for about eight or nine years and had gone to school with him. Against her attorney's advice to invoke her Fifth Amendment privilege, she stated that she had lied to the police because she was "madly in love" with Adams. Specifically, she asserted that she had been kept with Adams in the same room at the precinct, that everything in her statement was what Adams had told her to say earlier that day when he was arrested for attempted murder, and that she had lied in her statement. In fact, she maintained she had never heard about the incident or the party before that day. She testified that plaintiff contacted her by phone in early summer 2005, saying that he heard that she was testifying against him and asking her how she could be testifying when [*3]she was not at the party. Westbrook told him, "[Y]ou are right, I wasn't," and blamed one of Adams's other girlfriends. Westbrook was shocked to hear from plaintiff but denied being afraid of him.
ADA Scaccia, the supervising ADA of the homicide investigation, testified at the hearing that during the investigation she had found Westbrook to be a very credible witness concerning the shooting because of the detail she gave when describing the incident. Moreover, Scaccia testified that during an interview in the District Attorney's Office Adams had even discouraged Westbrook from testifying against plaintiff but Westbrook insisted that it was the right thing to do. Scaccia also noted that during Westbrook's testimony to the grand jury, she recounted many details that Adams had not provided and was very emotional. Scaccia testified that she never had the impression that Westbrook was testifying regarding anything that she had not personally seen, especially given the depth of detail with which she described the incident. In fact, Scaccia testified, Westbrook's value in testifying before the grand jury was that her account was more detailed than Adams's.
At the criminal trial, Adams and Detective Ramirez testified on behalf of the People. The People also called Westbrook to testify, but she invoked her Fifth Amendment privilege and declined to give substantive testimony.
Milan testified for plaintiff at the criminal trial in a manner inconsistent with his earlier statements as documented in the police report. Significantly, he now denied that anyone named Terry was present at the scene. He also testified that he saw the victim fighting with someone, other than plaintiff, that this person had a gun, and that he never saw the gunman fire. Plaintiff, as noted, was acquitted.
Plaintiff commenced this action in 2007 against the City of New York, New York City Police Department, and various John Doe police officers, setting forth claims for false arrest and imprisonment and malicious prosecution. Supreme Court granted defendants' motion for summary judgment dismissing the complaint. This appeal followed.
Whether the present civil claims should proceed to trial or warrant dismissal is governed, in the main, by two issues: whether the arrest was unlawful, and whether the prosecution was improperly motivated as measured against the standards discussed below. The fact that the criminal defendant - the present civil plaintiff - was acquitted at the criminal trial, a jury decision that could have been based on any number of factors about which we cannot now speculate, should not be used retrospectively to guide our analysis of these relevant inquiries for the civil case.
A plaintiff alleging a claim for false arrest or false imprisonment "must show that the defendant intended to confine the plaintiff, that the plaintiff was conscious of the confinement and did not consent to it, and that the confinement was not otherwise privileged" (Hernandez v City of New York, 100 AD3d 433, 433 [1st Dept 2012], lv dismissed 21 NY3d 1037 [2013]). The existence of probable cause to arrest "serves as a legal justification for the arrest" (Martinez v City of Schenectady, 97 NY2d 78, 85 [2001]) and "is a complete defense to such claims" (Hernandez, 100 AD3d at 433).
As defined by the Court of Appeals, "The elements of the tort of malicious prosecution are: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice" (Broughton v State of New York, 37 NY2d 451, 457 [1975], cert denied 423 US 929 [1975]).
The civil defendant moving for summary judgment in such cases must establish a defense to the plaintiff's malicious prosecution and false arrest claims as a matter of law by submitting sufficient evidence to eliminate any material issues of fact (De Lourdes Torres v Jones, 26 NY3d 742, 762-763 [2016]). Once a prima facie showing for dismissal has been made, the burden shifts [*4]to the party opposing the motion to raise a material issue of fact. Notwithstanding surmise about inferences a jury might draw, "the court on a summary judgment motion must indulge all available inferences of the absence of probable cause and the existence of malice" (De Lourdes Torres, 26 NY3d at 763).
The false arrest and imprisonment claims require an initial analysis of whether the arrest was predicated on probable cause. As will be demonstrated by recitation to the relevant record evidence below, dismissal of the claims is required because of the absence of any triable issues as to whether the police had probable cause to arrest plaintiff. Nor does the record allow any inferences to be drawn that the legality of the arrest was defective. It is well established that in order to establish probable cause to arrest, proof beyond a reasonable doubt is not required "but merely information sufficient to support a reasonable belief that an offense has been . . . committed" (People v Bigelow, 66 NY2d 417, 423 [1985]). Dismissal is required when "the facts leading up to the arrest, and the inferences to be drawn therefrom, [are] not in dispute" (Agront v City of New York, 294 AD2d 189, 189 [1st Dept 2002]). It is undisputed that two witnesses, who had known plaintiff for years, identified plaintiff to the police as the person who shot Richetti. The facts available to the police at the time of the arrest neither conflicted with the identification nor cast doubt on the witnesses. Nor did Adams's and Westbrook's accounts, which corresponded to the information available to police at the time, conflict with each other. Moreover, it is tellingly significant that their accounts were corroborated by plaintiff's own admission that he had been present at the party and involved in a fight. While not inculpatory with respect to the shooting, plaintiff thus enhanced the reliability of the identification evidence presented to police in connection with the resulting arrest. Nor was the identification evidence seriously undermined by statements from other witnesses, including conjecture that the shooter had come from a housing complex other than plaintiff's, which can be understood as vague details provided in the context of a traumatic and confusing event. We focus here on the reliable evidence, corroborated as just noted, available to police at the time of the arrest.
Plaintiff tries to locate factual uncertainty in what he describes as materially impeaching circumstances arising from the identifications by Adams and Westbrook such as would cause a reasonable person to doubt their reliability or credibility. Specifically, he selects aspects of Westbrook's deposition testimony that contradicted Ramirez's testimony wherein she asserts that she remained in a precinct room alone with Adams after he was arrested. There, plaintiff contends, Adams convinced her to corroborate his false accusation, and she did so by identifying plaintiff as Richetti's murderer, with Adams still in the room with her. Plaintiff further surmises that since Westbrook was Adams's 17-year-old pregnant girlfriend, they were both potentially motivated to identify plaintiff to mitigate Adams's own risks in facing prosecution.
The record, however, does not support plaintiff's speculative contentions. To the contrary, there is ample evidence of probable cause. Initially, Adams's identification of defendant and Westbrook's initial signed statement possess persuasive indicia of reliability. There is no reasonable basis under the circumstances of this case to controvert probable cause at the inception on the basis of Westbrook's later statement, after having been contacted by the murder suspect, that her identification had been a lie. Moreover, there is no nonspeculative basis to conclude that the police investigation otherwise was deficient in any manner such as would vitiate the probable cause leading to plaintiff's arrest. Numerous witnesses were interviewed, even if unproductively, and some understandably indefinite descriptions by bystanders after a fleeting but frightening event would not detract from the probable cause later predicated on the identifications by Adams and Westbrook. The conclusion supported by the record is that police acted diligently in interviewing witnesses and trying to establish leads. However, even if we were to accept Westbrook's later recantation testimony as true for the sake of argument, and to thus accord plausibility to plaintiff's argument, the possibility that Adams and Westbrook may [*5]have been privately motivated to minimize Adams's own punishment was not a valid reason for the police to doubt their credibility or the accuracy of their identifications. It bears repeating that they had known plaintiff for years, and that their detailed recollections corresponded with other information possessed by the police. In other words, whatever Westbrook's motivation, this was not a sufficient basis to undermine the witnesses' statements establishing probable cause. To the contrary, there is no sound basis on the evidence presented to propose that the police were "aware of materially impeaching circumstances' or grounds for questioning the [witnesses'] credibility" (Medina v City of New York, 102 AD3d 101, 104 [1st Dept 2012]), the basis proposed by plaintiff to defeat summary judgment.
Furthermore, even assuming, again for argument's sake, that additional police investigation could somehow have uncovered evidence that conflicted with the witnesses' statements, that evidence might have been relevant to the issue of reasonable doubt at the criminal trial at the back end of the prosecution. However, it would have provided no sound basis to controvert probable cause to arrest plaintiff at the front end of the criminal investigation predicated on the information and accusations provided to police by witnesses who had been present during the shooting and who were personally familiar with plaintiff (see Agront, 294 AD2d at 190).
This case stands in stark contrast to the cases relied on by plaintiff for upholding a false arrest claim. For example, in Sital v City of New York (60 AD3d 465 [1st Dept 2009], lv dismissed 13 NY3d 903 [2009]), the arresting officer admittedly had doubts about the credibility of the complainant who had accused the plaintiff of a fatal shooting, and the identification was arguably contradicted by physical evidence at the crime scene that was consistent with the conflicting statement of an independent eyewitness. Similarly, in Roundtree v City of New York (208 AD2d 407, 407 [1st Dept 1994]), the investigating officer
"admitted that he had harbored serious doubts about the witness' identification of plaintiff as the murderer, based upon several discrepancies in the witness' statements, bloody items found in the witness' apartment, the witness' sole access to the basement area where the victim had been found, and statements of several other witnesses to the effect that the witness had had a number of disputes with the victim."
There are no similar circumstances here, such as conflicting physical evidence or statements by other witnesses, that raised valid doubts about the witnesses' credibility or their identification of plaintiff as the shooter. To the contrary, Detective Ramirez as well as ADA Scaccia explained the circumstances upon which they found Westbrook's initial statement to be especially reliable.
Although the dissent concludes that the police should have doubted the mutually consistent, detailed statements by the identifying witnesses, it is hard to see, excepting unsupported speculation, what credible suspicions should have been harbored by police at the time the statements were given. We can confidently eliminate that contention. The dissent's contention that Westbrook's later recantation should, in effect, be applied retroactively to create a factual issue about the legality of the arrest overlooks the information available to police at the time of his arrest: as noted above, two identification witnesses personally familiar with plaintiff provided detailed statements consistent in all material respects about the murder and the shooter, which were not inconsistent with other information available to police, at an event where plaintiff admitted having been involved in an altercation. These facts easily established probable cause. Latif v Eugene Smilovic Hous. Dev. Fund Co., Inc. (147 AD3d 507 [1st Dept 2017]), cited by the dissent, where we found that factual issues involving constructive notice in a trip and fall case evaded summary disposition, has no bearing on the circumstances of this case.
Turning now to the malicious prosecution claim, plaintiff's indictment created a presumption of probable cause for the criminal proceeding (Colon v New York, 60 NY2d 78, 82-83 [1983]; see also De Lourdes Torres, 26 NY3d at 761]). The presumption "may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith" (Colon, 60 NY2d at 82-83). This record does not evince any such improprieties. Moreover, even if a plaintiff rebuts the presumption of probable cause, he or she still must establish as a jury issue that the defendant acted with malice, i.e., that the defendant " must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served'" (De Lourdes Torres, 26 NY3d at 761, quoting Nardelli v Stamberg, 44 NY2d 500, 503 [1978]). Malice, too, is not evident in this record.
Although false arrest and malicious prosecution are "kindred actions" (Broughton v State of New York, 37 NY2d at 456, "the unique elements of malicious prosecution typically present a greater obstacle to recovery than the elements of false arrest" (De Lourdes Torres at 760). Unlike De Lourdes Torres, where factual issues existed regarding a coerced confession, an officer's possibly misleading account to the plaintiff about her polygraph test, the possibility that police officers may have withheld DNA and other evidence, and the dismissal of the criminal charges on the District Attorney's motion, supportable indications of such bad faith are not manifest in this record. Moreover, as that decision cautioned, it did not "signal that every allegation of the falsification of material evidence is a talisman shielding a plaintiff from summary judgment. It remains the law that a plaintiff's vague and conclusory assertions that the police fabricated evidence are insufficient to enable false arrest and malicious prosecution claims to survive a summary judgment motion" particularly where the plaintiff's claim of fabricated evidence "does not eliminate all questions as to probable cause" (De Lourdes Torres at 771). That caveat to the reinstatement of the civil claims in that case is especially applicable herein. The dissent's reliance on Ramos v City of New York (285 AD2d 284 [1st Dept 2001]), is similarly misplaced. The Ramos prosecution evinced prosecutorial recklessness in the extreme, with substantial and virtually undisputed undertones of malice. In that 42 USC § 1983 action premised on false arrest and malicious prosecution in a child sexual abuse prosecution, exculpatory evidence was ignored and suppressed, the young child's claims had the appearances of fabrication, and the medical expert who ruled out child sexual abuse relayed that conclusion to the District Attorney but he was not called as a witness nor was that information disclosed to the plaintiff. These and other glaring defects in the investigation and prosecution vitiated the conviction for which the plaintiff had spent several years incarcerated as a sexual predator before Supreme Court vacated the conviction pursuant to CPL 440.10. Our court found ample grounds for the subsequent civil action. Ramos has no applicability to the facts of this case.
Any notion of malice propelling the prosecution forward is further dispelled in view of Detective Ramirez's deposition testimony establishing the continuing validity of the probable cause, notwithstanding Westbrook's recantation, predicated on Adams's continual and emphatic insistence that he had witnessed plaintiff shoot and kill Richetti, coupled with the reasonable belief by police that Westbrook's recantation was motivated by fear of plaintiff after he called her prior to the trial. Hence, probable cause was well established for the reasons already discussed above, and plaintiff has failed to raise a triable issue regarding malice as an element of malicious prosecution. Rather, plaintiff merely engages in groundless speculation that police withheld information from the District Attorney's office during the prosecution.
Plaintiff next turns to Milan's deposition testimony in an attempt to establish the requisite malice. Milan testified, contrary to his statement to police, that he had unequivocally informed Detective Ramirez during his interview that he knew plaintiff but had not seen him at the party, [*6]that plaintiff was not present during the homicide, and that plaintiff was not the shooter. Milan also stated that Detective Ramirez showed him a photograph of plaintiff, and had him draw a circle around plaintiff's picture. Milan, nonetheless, admitted that he did not see the shooting. Rather, as noted above, Milan had earlier related to police that when a "kid" fired shots into the air he ducked behind a car, after which he heard 7 to 10 shots. When he looked out, he saw Richetti, who had been fighting with another person, lying on the ground bleeding from his head. Interestingly, plaintiff had placed himself at the scene in a physical altercation, another factor that fatally diminishes Milan's belated attempted exculpation of plaintiff employed now in the civil action for purposes of establishing malicious prosecution.
However, even assuming - again for the sake of argument - that Milan had exculpated plaintiff in his police interview, police still had a reasonable basis to rely on Adams and Westbrook, who had provided contrary information inculpating plaintiff as the shooter preceding the arrest and prosecution. In a confusing street scene such as occurred here, the police were not required to resolve all uncertainties or conflicting evidence for purposes of establishing probable cause at the inception of the criminal investigation; that task, evaluating reasonable doubt, was for the jury in the criminal trial.
In any event, it is evident that Milan's testimony, that the police withheld information in their report, lacks indicia of reliability. The record does not support a contention that the "investigation was conducted in a manner which deviated so egregiously from proper police procedure as to indicate intentional or reckless action by the lead detective" (Williams v City of New York, 114 AD3d 852, 854 [2d Dept 2014]). Nor does plaintiff provide anything to support a reasonable inference that Detective Ramirez acted with an improper motive, or had any motive other than discharging his professional responsibilities. The record is devoid of any inference evincing the requisite malice consisting of a "total lack of probable cause" or that the civil defendants or law enforcement "intentionally provid[ed] false information" (Cardoza v City of New York, 139 AD3d 151, 164 [1st Dept 2016]). Once the unsupported surmises proposed by plaintiff are eliminated, it is apparent that the record is bereft of any unresolved factual issues.
Accordingly, the order of the Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about May 23, 2017, which, to the extent appealed from as limited by the briefs, granted defendants' motion for summary judgment dismissing plaintiff's claims for false arrest and imprisonment and malicious prosecution, should be affirmed, without costs.
All concur except Sweeny, J.P. and Gesmer, J. who dissent in an Opinion by Gesmer, J.




GESMER, J. (dissenting)


I respectfully dissent.
Plaintiff was arrested and indicted for murder in the second degree in connection with the death of Jamie Richetti, who was shot fatally on November 3, 2002 outside a party at the community center of the Soundview Houses in the Bronx. Plaintiff was later acquitted. He commenced this action against the City of New York and several individual police officers for, inter alia, false arrest and imprisonment and malicious prosecution. The motion court granted summary judgment to all defendants and dismissed the complaint. I would reverse that order since, in my view, plaintiff has raised triable issues of fact sufficient to defeat summary judgment.
The record reveals the following. After the shooting, Detective Gilbert Ramirez was assigned to the homicide investigation, and police canvassed the area. The investigation did not recover a weapon, fingerprints, or DNA. Witnesses interviewed by the police gave descriptions of the shooter that varied as to his height, age, and skin tone. Several witnesses stated that they believed that the shooter had come from the Castle Hill Houses.
Angel Milan, a friend of the victim, was among the people interviewed by the police. Detective Ramirez documented in a DD-5 report that he spoke to Milan at the precinct on November 3, 2002, and that Milan claimed that he had been at the party at the community center and then left. When Milan returned, he saw a fight break out that led to gunfire, and he hid behind a car. When Milan got up from behind the car, Richetti had been shot and was on the ground. When Milan was deposed in this action, he testified that, at the precinct, he explicitly informed the police that plaintiff was not the shooter. This information does not appear in the DD-5.
On May 2, 2003, Detective Ramirez traveled to the home of Henry Adams to arrest Adams for an unrelated shooting. Adams's girlfriend, Crystal Westbrook, who was then 17 years old and pregnant, was present at the time of the arrest. Detective Ramirez brought both Adams and Westbrook to the 43rd Precinct.
At the precinct, Adams informed police that he was interested in making a deal with the District Attorney's office and claimed that he had information related to the Richetti homicide [FN1]. Adams made a statement to the police in which he reported that he and Westbrook were at the party when a fight broke out over a "chain snatch." The fight spilled outside. "Wayno," also known as "Pee-Wee," allegedly pulled out a handgun and fired into the crowd, striking a "kid" who fell to the ground [FN2].
The events following Adams's statement are in dispute. Detective Ramirez testified that, after Adams gave his statement, he separately interviewed Westbrook in an interrogation room where she gave a statement in which she also claimed to have been at the party and witnessed a fight over a chain snatch. Detective Ramirez testified that Westbrook claimed that a man known to her as "Wayne" pulled out a gun and fired a shot at another man who fell to the ground and did not move again. He also testified that Westbrook and Adams were not alone together at the precinct before he interviewed each of them.
According to Detective Ramirez, he showed Adams and Westbrook a photograph of plaintiff and the two said that they knew him because they had grown up in the same neighborhood. He also noted that their statements matched some information the police had already received, since other witnesses had claimed that a fight broke out at the party and that someone known as "Pee-Wee" may have been involved [FN3]. Notably, Detective Ramirez testified that Adams's and Westbrook's stories were "not made up," because "[t]hey were both [*7]interviewed separately and they pretty much had the same story. It is not like they had time to rehearse it unless they did prior to [Adams] being arrested. It's kind of a big story to come up with when he was arrested. She is in one room and he is in a different area. She says pretty much the same thing." By contrast, Westbrook has maintained that she and Adams were allowed to be in the same room at the precinct before she gave her statement and that her statement was a lie that Adams coached her to tell.
Before plaintiff's trial, Westbrook informed the District Attorney's Office that she did not want to testify because she had not seen the incident and that she had previously lied. At a hearing held on whether Westbrook could be declared an unavailable witness, Westbrook testified that when she went to the precinct, she believed that she was "under arrest." She said that she told Detective Ramirez what Adams had told her to say. She explained that, at the time, she was "madly in love" with Adams and that he was "try[ing] to snitch," and "tried to put [her] in it." She said that she was unaware of the incident and had only learned about it after Adams had gotten "locked-up." Westbrook testified that she and Adams had never spoken about the party before May 2, 2003. Westbrook also testified that she and Adams were allowed to be together "all night" at the precinct, and that Detective Ramirez and Adams were in the room when she gave her statement. While Westbrook had testified for the District Attorney's office in the grand jury, she testified at the hearing that her grand jury testimony was a lie and that she was not present at the shooting.
At her deposition taken in connection with this matter, Westbrook reiterated that she was allowed to be in the same room with Adams, that Adams had coached her to tell a lie, and that Westbrook made her statement to Detective Ramirez with Adams in the room.
It is undisputed that, after obtaining the statements of Adams and Westbrook, Detective Ramirez received authorization from the District Attorney's office to arrest plaintiff.
Where a defendant moves for summary judgment as to false arrest and malicious prosecution claims, the facts must be viewed in the light most favorable to the plaintiff, and "even if the jury at a trial could, or likely would, decline to draw inferences favorable to the plaintiff on issues of probable cause and malice, the court . . . must indulge all available inferences of the absence of probable cause and the existence of malice" (De Lourdes Torres v Jones, 26 NY3d 742, 763 [2016]).
Regarding the false arrest and imprisonment cause of action, I would hold that the evidence demonstrates that there is a triable issue of fact as to whether the police had probable cause for plaintiff's arrest [FN4]. The police's sole basis for probable cause was the statements made by Adams and Westbrook identifying plaintiff as the person who shot and killed Richetti. "[T]he fact that an identified citizen accused an individual who was known to her of a specific crime, while generally sufficient to establish probable cause, does not necessarily establish it" (Medina v City of New York, 102 AD3d 101, 104 [1st Dept 2012]). Here, plaintiff has raised a triable issue of fact as to whether those two statements gave police probable cause to arrest him by presenting evidence that the statements may have been made under "materially impeaching circumstances" (id. [internal quotation marks and emphasis omitted]; see People v Gonzalez, 138 AD2d 622, 623 [*8][2d Dept 1988], lv denied 71 NY2d 1027 [1988]) in four respects.
First, plaintiff submitted deposition testimony showing that the statements were not sufficiently reliable (see Sital v City of New York, 60 AD3d 465, 466 [1st Dept 2009], lv dismissed 13 NY3d 903 [2009]; Fausto v City of New York, 17 AD3d 520, 521-522 [2d Dept 2005]). One statement came from Adams, an individual under arrest and facing unrelated assault charges, who was eager to obtain a cooperation agreement to avoid jail and who did not come forward until six months after the incident and only when it was in his interest to do so. The other statement came from his 17-year-old pregnant girlfriend, Westbrook, who testified that she was alone with Adams after he was arrested, he convinced her to corroborate his accusations against plaintiff, and she provided her statement to police identifying plaintiff as the murderer with Adams in the room. A reasonable jury could find that these were materially impeaching circumstances, as both individuals were motivated to have Adams avoid punishment for assault by providing testimony against plaintiff for a more serious crime.
Second, the testimony of Westbrook and that of Detective Ramirez are directly contradictory as to whether Adams and Westbrook had been left alone together in the precinct, and whether Westbrook delivered her statement to Detective Ramirez with Adams in the room. Detective Ramirez specifically identified the alleged separation of Adams from Westbrook as a basis for believing their statements. If a jury were to credit Westbrook's version of the events, the jury might very well conclude that defendants acted unreasonably by relying on the statements to supply probable cause (cf. Smith v Nassau, 34 NY2d 18, 24-25 [1974] [where reasons existed for officer to doubt complainant's identification, reasonable people could differ as to the reasonableness of the officer's reliance on that identification and the issue could not be decided as a matter of law]).[FN5]
Third, no other witness identified plaintiff as the shooter, and no physical evidence connected plaintiff to the shooting. Since no other evidence identified plaintiff, the police's failure to conduct any further investigation to corroborate or otherwise probe the accuracy of Adams's and Westbrook's statements calls into question the reasonableness of the police's reliance on those statements to supply probable cause (see Sital, 60 AD3d at 466; Roundtree v City of New York, 208 AD2d 407, 407 [1st Dept 1994]).[FN6]
Fourth, there is evidence in the record affirmatively suggesting that plaintiff was not the shooter. The shooter was identified as being from the Castle Hill Houses, but plaintiff did not [*9]live in that housing project [FN7]. In addition, Milan testified that he informed the police that plaintiff was not the shooter but this information did not appear in the DD-5 [FN8].
I turn now to the malicious prosecution cause of action. "The elements of the tort of malicious prosecution are: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice" (De Lourdes Torres, 26 NY3d at 760 [internal quotation marks omitted]). Plaintiff was indicted and subsequently acquitted; thus, there is no question that a criminal proceeding was commenced against him that terminated in his favor. As to the remaining elements, plaintiff has, in my view, raised triable issues of fact.
Although plaintiff's indictment creates a presumption of probable cause (Colon v New York, 60 NY2d 78, 82-83 [1983]; see also De Lourdes Torres, 26 NY3d at 761), plaintiff presented sufficient evidence to rebut this presumption and raise a question of fact as to whether " the police witnesses have not made a complete and full statement of facts . . . to the District Attorney, that they have misrepresented or falsified evidence, [and] that they have withheld evidence or otherwise acted in bad faith'" (De Lourdes Torres, 26 NY3d at 762, quoting Colon, 60 NY2d at 82-83).
At some point after he took the statements of Adams and Westbrook, Detective Ramirez sought and obtained authorization from the District Attorney's office to arrest plaintiff. Since, as discussed in the context of plaintiff's false arrest and imprisonment cause of action, an issue exists as to whether Adams and Westbrook made their statements under materially impeaching circumstances, I would hold that the record raises a question of fact as to whether Detective Ramirez obtained authorization from the District Attorney's office either by failing to give a complete statement of the facts or by misrepresenting the circumstances under which the statements were made (De Lourdes Torres at 762-763). In addition, since Milan's statement that plaintiff was not the shooter did not appear in the DD-5, this alleged omission further raises a question of fact as to whether the police either failed to make a full showing of the facts or misrepresented them.
Plaintiff has also raised a triable issue as to the malice element of malicious prosecution. This element "is seldom shown by direct evidence of an ulterior motive, but is usually inferred from the facts and circumstances of the investigation" (Ramos v City of New York, 285 AD2d 284, 300-301 [1st Dept 2001]). I would hold that, based on the materially impeaching circumstances identified in my discussion of the false arrest and imprisonment cause of action, the record raises triable issues as to whether the police "show[ed] a reckless or grossly negligent disregard for [plaintiff's] rights" (Ramos, [*10]285 AD2d at 300) by relying upon Adams's and Westbrook's statements to furnish probable cause and by failing to conduct further investigation into their veracity.
Order, Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about May 23, 2017, affirmed, without costs.
All concur except Sweeny, J.P. and Gesmer, J. who dissent in an Opinion by Gesmer, J.
Sweeny, J.P., Tom, Gesmer, Oing, Singh, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: MARCH 21, 2019
CLERK



Footnotes

Footnote 1: At his deposition, Detective Ramirez acknowledged that arrestees who provide information about serious or violent crimes "are looking to get out of jail."

Footnote 2: On July 1, 2004, after plaintiff's arrest, Adams entered into a cooperation agreement with the District Attorney's office. The cooperation agreement provided that if Adams, inter alia, fully cooperated in plaintiff's prosecution, Adams would receive a plea to a reduced charge and a recommendation from the District Attorney's office that he receive a sentence of probation.

Footnote 3: One police document in the record indicates that "Pee-Wee" is a nickname used by a man named Duvall Blake. Another document indicates that, while Richetti's father believed that "Pee-Wee" may have been responsible, "Pee-Wee" lived in the Castle Hill Houses.

Footnote 4: The elements of a cause of action for false arrest and imprisonment are: "the defendant intended to confine the plaintiff . . . the plaintiff was conscious of the confinement . . . the plaintiff did not consent to the confinement and . . . the confinement was not privileged" (De Lourdes Torres, 26 NY3d at 759). An act of confinement is not privileged if it stems from an unlawful arrest unsupported by probable cause (id.).

Footnote 5: Accordingly, I disagree with the majority's efforts to suggest that, as a matter of law, the police could not be faulted for believing Westbrook's statement at the precinct. It is impossible to reach such a conclusion without crediting Detective Ramirez and discrediting Westbrook, a credibility issue that we cannot resolve on this motion (see e.g. Latif v Eugene Smilovic Hous. Dev. Fund Co., Inc., 147 AD3d 507, 508 [1st Dept 2017] ["(C)redibility issues are not appropriately resolved on a summary judgment motion"]).

Footnote 6: The majority argue that this case is distinguishable from Sital (60 AD3d at 465) and Roundtree (208 AD2d at 407), since in each of those cases police had reasons to doubt their witnesses but nonetheless failed to conduct further investigation. However, the record in this case also suggests that the police had reasons to have doubted Adams and Westbrook. 

Footnote 7: At the time of the shooting, plaintiff lived with his grandmother at the Soundview Houses, across the street from the community center.

Footnote 8: While the majority highlight certain inconsistencies in Milan's testimony, those inconsistencies go to Milan's credibility, which is for the jury to determine (Latif, 147 AD3d at 508). Moreover, on this motion, we must view the evidence in the light most favorable to plaintiff and afford him the benefit of every favorable inference as to the absence of probable cause, even if a jury would decline to draw the same inference at trial (see De Lourdes Torres, 26 NY3d at 763).